UNITED STATES of America ex rel. Thomas DURSO and Michael Gargano, Petitioners-Appellants,

v.

Frank J. PATE, Warden, Respondent-Appellee.

No. 17762.

United States Court of Appeals, Seventh Circuit.

April 30, 1970.

Rehearing Denied June 30, 1970.

John J. Crown, Chicago, Ill., Arthur J. O'Donnell, Chicago, Ill., for petitioners-appellants.

Thomas J. Immel, Asst. Atty. Gen., Chicago, Ill., Joel M. Flaum, William J. Scott, Atty. Gen. of Illinois, Chicago, Ill., for appellee; Roger C. Nauert, Asst. Atty. Gen., of counsel.

Before FAIRCHILD and CUMMINGS, Circuit Judges, and MORGAN, District Judge.[1]

MORGAN, District Judge.

In October, 1964, appellants, Thomas Durso and Michael Gargano, were convicted in the Circuit Court of Cook County, Illinois, of the crime of murder of one Anthony Moschiano. The Illinois Supreme Court affirmed their convictions. People v. Durso, 40 Ill.2d 242, 239 N.E.2d 842 (1968), cert. denied, 393 U.S. 1111, 89 S.Ct. 923, 21 L.Ed.2d 807 (1969). They then filed a petition for a writ of habeas corpus in the court below, alleging several grounds on which it was contended that their conviction was obtained in violation of the Constitution of the United States.

On May 28, 1969, the court denied the petition and dismissed the cause. On the same date, the trial judge filed a Memorandum of Opinion containing a narrative statement of his findings of fact and conclusions of law. Appellants have appealed from that decision.

 The principal contention by appellants is that they were denied due process of law and a fair trial because evidence of other criminal offenses was admitted at their trial.

The petition alleged: "The People were allowed to introduce, over objection, evidence of violations of the Illinois Narcotic Drug Act, not by petitioners, but by others out of the presence of the Petitioners and in so doing, so inflamed the passion and prejudice of the jury as to deny to the petitioners a fair trial for the crime of which they were charged."

 In this connection, appellants contend that the trial judge dismissed their petition on this point upon his holding that the issue was *res adjudicata* because of the denial of certiorari by the United States Supreme Court. Had the court based its decision upon that ground, the ruling would have been erroneous, Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); but when the reference to *"res adjudicata"* is read in context, the appellants' contention is seen to be without merit.

With reference to the contention that evidence of other crimes had been admitted, the judge concluded in his memorandum that no constitutional question was raised by the petition, that the allegation related only to the relevancy of evidence, and that such evidence, when submitted to a jury, was for the jury to weigh and evaluate with all other evidence in arriving at its verdict. In that context, the judge noted that the convictions had been affirmed by the Illinois Supreme Court and certiorari had been denied, concluding with the statement: "The question is now *res adjudicata.*"

We think a proper reading of that paragraph of the district court's memorandum requires the conclusion that the court was construing the issues presented by the petition, and it concluded that the only question properly raised with relation to that evidence was the question of the relevancy of evidence. In that context, then, the ruling by the State's highest court upon the question of relevancy and admissibility of evidence could properly be said to be *res adjudicata.* We do not read the opinion as stating that the raising of a constitutional question is barred by the fact of denial of certiorari by the United States Supreme Court.

In discussing the admission of the evidence of which complaint is made, the Supreme Court of Illinois said that the evidence of other criminal activities was relevant and had a probative bearing upon the issue of motive and intent which attended the commission of the murder charged.

1. Judge Robert D. Morgan is sitting by designation from the United States District Court for the Southern District of Illinois.

It has often been stated, as a general rule, that evidence of prior criminal acts of an accused which are not charged in an indictment is inadmissible [*e. g.*, United States v. Fierson, 419 F.2d 1020 (7th Cir. 1969); United States v. Menk, 406 F.2d 124 (7th Cir. 1968), cert. denied, 395 U.S. 946, 89 S.Ct. 2019, 23 L.Ed.2d 464 (1969)]; but the true general rule is not nearly so broad. Evidence of other criminal activities is clearly admissible if it is relevant to indicate motive or some other element of the crime charged, unless minor probative value is outweighed by major prejudicial effect. *E. g.*, United States v. Fierson, *supra*; United States v. Marine, 413 F.2d 214 (7th Cir. 1969). The question on admissibility is, in the first instance, a matter addressed to the discretion of the trial court. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Fierson, *supra*.

In each case, then, upon direct review, a procedural question is presented whether there was a permissible exercise of discretion in admitting evidence of other criminal activity. We think the constitutional concept in a habeas corpus case must parallel that procedural question. No precise rules can be laid down in either instance. The issue, in each instance, requires a determination whether the probative value of the evidence, for the purpose for which it was admitted, outweighs the prejudice to the accused in the admission of that evidence. Grunewald v. United States, 353 U.S. 391, 420, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); United States v. Fierson, *supra* 419 F.2d at 1022. When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then the use of such evidence by a state may rise to the posture of the denial of fundamental fairness and due process of law.

As we have noted, the Illinois Supreme Court held that the evidence here complained of was properly admitted because it tended to prove motive. With one possible exception, we are convinced that the evidence did have a great probative value to show a single, continuing series of related transactions within a brief time which culminated in the commission of the crime charged.

As appellants suggest, the evidence is properly divided into two categories. The first relates to evidence of criminal activities in which appellants, or one of them, participated. The second relates to criminal activities in the sale or purchase of drugs in which neither defendant was shown to have directly participated.

There were two incidents in the first category prior to the date of the alleged murder. In the first, Lupe Costible, a narcotics addict and friend of the victim, testified that shortly prior to Christmas, 1963, she went with Durso and Moschiano in Durso's automobile to a housing development on the South Side of Chicago, wherein a sale of a quantity of heroin was to be concluded by Moschiano. She testified that, upon arriving at the housing development, Durso waited in the car while she and Moschiano went inside one of the buildings in the development. Upon returning to the car, Moschiano explained to Durso that the sale had not been concluded because the prospective purchaser did not have the money and, also, because the purchaser was suspicious of Durso's car, which contained a plaque indicating some connection with the Chicago Police Department. During the drive to return Lupe to her apartment, a conversation ensued between Durso and Moschiano, in which Moschiano requested, and Durso agreed, that Moschiano would sell the heroin involved on the streets. She further testified that Durso had consented to that arrangement upon the condition that Durso receive payment for the narcotics within two weeks.

Thereafter, on January 8, 1964, a man named Fiorenzo had a conversation with Durso, at which time Durso stated that he had given a large quantity of narcotics to Moschiano for sale, that he had not seen Moschiano in some time, that he knew that Fiorenzo and Moschiano

had been together for several days, and that Fiorenzo was in trouble and his life depended on finding Moschiano. Fiorenzo then went with Durso to Moschiano's home. Failing to find him there, they drove to a restaurant where they were joined by Gargano. The three of them then proceeded in Durso's car to Lupe's rooming house. Upon arrival at the rooming house, Durso demanded of Nancy Bourne, Lupe's landlady, the key to Lupe's room. Gargano remained downstairs holding a pistol on Fiorenzo and a man who roomed in the building, while Durso and Mrs. Bourne went upstairs to Lupe's room. During the search of Lupe's room by Durso, he knocked Mrs. Bourne down, whereupon he drew a pistol and told her to get up. She said that she had recently broken her back and couldn't get up, whereupon Durso swore that he would break her back again and would blow her head off if she didn't get up. He then forced Mrs. Bourne downstairs and forced her to phone Moschiano. When someone answered the call, Durso grabbed the phone from Mrs. Bourne and told the answering party to have Moschiano on the street within ten minutes or someone would be hurt. Durso then sent Gargano to get Moschiano. After Gargano and Moschiano returned, Moschiano and Fiorenzo were handcuffed together and taken from the Bourne home. Later both were released with the understanding that Moschiano was to sell the remaining heroin within two weeks and deliver the proceeds to Durso.

In the second category, there were a number of instances of testimony relating to the sale or the use of narcotics by Moschiano, Fiorenzo, and others. Lupe testified that after the abortive trip to the South Side, she kept the parcel of heroin overnight. She further testified that Moschiano had picked up the parcel on the following day, and that two or three days thereafter she went with Moschiano and a drug addict by the name of Buonaro to a hotel where they proceeded to cut the heroin by mixing it with a white powder procured and supplied by Buonaro. She further testified

that a part of the narcotics was wrapped in foil packages, and that both Moschiano and Buonaro took a part of the wrapped packages. Lupe also testified that the three of them at that time took injections of heroin.

Fiorenzo testified that during the period of time between Christmas, 1963, and January 6 or 7, 1964, he and an addict named Melkonian had occupied a hotel room together, during which time Fiorenzo saw Moschiano daily and on each occasion purchased narcotics from him.

Fiorenzo testified that on January 9, 1964, he and Moschiano rented a room at the Cass Hotel, where they divided a part of the narcotics into about 200 small packages. They then took some four ounces of heroin not yet packaged to the Ontario Hotel, where they rented a room and packaged up fifty additional packages, each somewhat larger than the 200 which had been prepared at the Cass Hotel. The packages of narcotics were stored at the Ontario Hotel in a padlocked room. On about January 9 and 10, 1964, Fiorenzo made sales of a part of the narcotics to an addict by the name of Cancialosi for the sum of $200. He testified that he then left $175 of that money with Jimmy Green at Green's Tavern to be picked up by Moschiano.

There was further testimony by Fiorenzo to the use of narcotics by himself, Moschiano, and others during the period of time intervening.

Shortly after the narcotics were packaged and stored at the Ontario Hotel, Fiorenza and Melkonian, who were police informers, went to police headquarters where they reported to a Detective Brown. For some six days thereafter, both were confined to the witnesses' quarters maintained by the State's Attorney of Cook County. Meanwhile, Moschiano, who was also a police informer, led officers to the Ontario Hotel room where the narcotics were seized.

That background of criminal activity led up to the events of January 21, 1964. On that date, shortly following Fiorenzo's release from custody, Durso contacted

Fiorenzo at a restaurant, at which time Fiorenzo told him that he had been arrested for petty theft and that he had been confined for six days. He also told Durso at that time that Moschiano had also been confined, and that during their confinement someone had broken into the Ontario Hotel and stolen the narcotics. He then asked Durso if Moschiano had give him the $175 that Fiorenzo had left with Green. Durso replied that Moschiano had not mentioned it, and the two of them then went to Green's Tavern where Durso asked Jimmy Green about the money. At that point Durso ordered Fiorenzo to take Durso's car and pick up Moschiano "in the neighborhood."[2] Fiorenzo did so, after which the three of them drove to a place which was later identified as Durso's suburban home. Enroute, Durso asked Moschiano why he had never mentioned the money he had picked up from Green. Moschiano told him that he still had the money, along with other money from sales of narcotics, which he would deliver to Durso. Moschiano further told Durso that he had the opportunity to make a kilogram sale of heroin and that he would make up for the missing money and missing narcotics from the proceeds of that sale. Durso stated that he was not going for that sale.

When the three of them arrived at Durso's home, Fiorenzo parked the car in Durso's garage. The three of them went into the house where they were met by Gargano. Gargano asked Moschiano what had happened to the heroin. Moschiano said that the hotel room had been broken into and that the narcotics had been stolen. He further told Durso and Gargano that if they didn't go for the kilogram sale which he proposed, he was a thief and he would pay back the money he owed them on an installment basis from the proceeds of theft. Fiorenzo testified that shortly after that conversation Durso had stabbed Moschiano to death in the trunk of Durso's car in the garage at his home. Durso told

Fiorenzo at that time, "I want you to look at this (Moschiano's body). This is what happens to stool pigeons and people that short me." He then told Fiorenzo that he would give him the break of his life and let him go, and if any one in the neighborhood asked him about his having picked up Moschiano he was to say that he did pick him up but that he dropped him off two or three blocks from the point where he had picked him up. Gargano then drove Fiorenzo to an elevated train station and the latter took a train back to Chicago's West Side. He then reported the incident to the police.

Following the recovery of Moschiano's body from the Des Plaines River near Chicago in April, 1964, appellants were arrested. During all of the critical time, Durso was a member of the Chicago Police Department.

From the date of the abortive sale of narcotics shortly prior to Christmas, 1963, to the fatal day of January 21, 1964, all testimony as to criminal activities, both those participated in by the defendants, or one of them, and those committed by others, relate to the heroin which Durso had supplied to the victim for sale. That evidence was probative as showing motive and intent, and was part and parcel of a continuing series of transactions related to a particular quantity of narcotics which led to and were the reason for the perpetration of a brutal murder. There was no denial of due process in its use. Cf., United States v. Tuffanelli, 131 F.2d 890 (7th Cir. 1942), cert. denied, 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. 1142 (1943); United States v. Sebo, 101 F.2d 889 (7th Cir. 1939).

That evidence is directly probative of the motive for the murder with which appellants were charged. It is not a proper constitutional inquiry whether the crime could have been proved without the admission of all the evidence of prior criminal activities of various persons. The Constitution certainly does not re-

---

2. All persons involved were from the same West-side neighborhood of Chicago.

quire that the State must have limited its case to Fiorenzo's testimony that Durso, a member of the Chicago Police Department, stabbed a man to death in the trunk of his car, and have omitted all evidence of the motive and the passion that went into that act. The evidence introduced tended to prove and explain that point. The evidence was relevant, and it did have a legitimate probative value to prove the State's case against the appellants. There can be little doubt that appellants were prejudiced by the introduction of the evidence, but that is a prejudice which must be weighed against the probative value of the evidence and the interest of the State in the enforcement of its criminal laws. We cannot say that the State's treatment of that evidence overstepped the bounds of constitutional principle.

■ The one exception, with reference to evidence of other crimes, related to Fiorenzo's testimony that he and Moschiano had purchased narcotics from one Savonia in mid-December, 1963. The opinion of the Illinois Supreme Court does not mention that evidence, which would seem on the surface to have questionable relevancy. Neither Durso nor Gargano was shown to have had any connection whatsoever with that offense or any knowledge of that narcotics sale; but if its admission was error, it was harmless error which would not require a reversal. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 21–22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Its only tendency was to brand Fiorenzo and Moschiano as narcotics addicts wholly separate from any relation to appellants. As to appellants, it was inconsequential and surely lost in the constitutionally permissible testimony of the appellants' activities in the narcotics trade.

■ As an adjunct to the argument related to evidence, it is now contended that Gargano was denied due process of law because the trial judge did not order a severance and a separate trial for him in the light of the intro-

duction of evidence of other criminal activities with which he was not shown to be in any way connected.

That contention is clearly without merit. Both Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); and United States v. Gougis, 374 F.2d 758 (7th Cir. 1967), wherein it is stated that a trial court has a continuing duty to grant a severance when prejudice from a joint trial is apparent, arose under Rules 8(b) and 14 of the Federal Rules of Criminal Procedure. Those rules do not apply to a trial by a state court of a state charge.

Even in the context of the Federal Rules, this court has held that the denial of a motion for severance is reversible error only if prejudice is so clearly shown that refusal of a severance is an abuse of discretion. United States v. Harris, 211 F.2d 656 (7th Cir. 1954), cert. denied, 348 U.S. 822, 75 S.Ct. 34, 99 L.Ed. 648 (1954).

Gargano's counsel made no motion for a severance and for a separate trial. He did object to the testimony, and upon each instance the trial judge instructed the jury that the evidence was not admitted as to Gargano. The Illinois Supreme Court has held that in the absence of a showing to the trial court of the manner of prejudice, a defendant cannot successfully appeal upon the ground that a severance was not ordered. People v. Minnecci, 362 Ill. 541, 200 N.E. 853 (1936). The inappositeness of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), and Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), to this case is patently apparent. There is no record showing of prejudice to Gargano which requires the conclusion that he was denied due process.

■ The final contention of the appellants is that they were denied due process of law because the State failed to produce for their use at the trial a report by Chicago Police Officer Novak.

After Nancy Bourne had testified, appellants demanded that all statements theretofore made by Mrs. Bourne be produced for their use on cross-examination. At that point, a written statement by Mrs. Bourne was delivered to the appellants and Mrs. Bourne was subjected to cross-examination.

In their motion for new trial, appellants urged that Officer Novak had talked to Mrs. Bourne and one Merle Flatt shortly after the occurrence on January 8, 1964, and that that officer's report as to descriptions of the men involved, which was couched in police code designations, contained descriptions of Mrs. Bourne's assailants which did not match the descriptions of the appellants. Officer Novak was not called as a witness by either party, although his name was included on the witness list supplied to the appellants in advance of the trial. His only connection with the case was his investigation of the Bourne incident. His report itself does not indicate whether the descriptions of suspects therein were based on statements made to him by Mrs. Bourne on statements of other persons or on some composite. It simply contained a description of suspects being sought, with no indication that Mrs. Bourne either gave the descriptions or later agreed that they were accurate.

The cases principally relied upon by defendants are neither controlling nor persuasive on the situation here presented. Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), involved what the court characterized as a knowing use of false evidence by the State to obtain a conviction of murder. Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), involved the failure by the State, in a rape case, to disclose police reports containing prior inconsistent statements attributed to the prosecuting witness and information that the prosecuting witness was sexually promiscuous. The result was a remandment of the case to the State court to make a determination whether there was a duty under the circumstances to disclose that information to the defend-

ant. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), held that the withholding of evidence favorable to the accused is a denial of due process if such evidence would be relevant to either of the issues of guilt or punishment. Here Mrs. Bourne was not a principal witness on the murder, and, even if she had been forced to admit on cross-examination that she had furnished some basis for the descriptions in the Novak report, it would not have undermined the prosecutor's case significantly on the crime charged. There is no problem of perjured testimony here, and the absence of the Novak report hardly either seriously belied the fact finding process or prevented defense counsel from adequately representing their clients at the trial. If failure to produce the Novak report is subject to any criticism at all, it simply cannot be said to have been sufficiently important to amount to a denial of due process of law.

We have considered all nuances of argument advanced by appellants. We conclude that none of them show the denial of due process of law.

The judgment is affirmed.