**UNITED STATES of America**

v.

**Bernard John FIGURELL, Appellant.**

**No. 71-2040.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule
12(6) March 7, 1972.

Decided June 5, 1972.

Jay Paul James, Morris, James, Hitchens & Williams, Wilmington, Del., for appellant.

Norman Levine, Asst. U. S. Atty., Wilmington, Del., for appellee.

Before BIGGS, VAN DUSEN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

On May 1, 1971, the district court, sitting without a jury, found Bernard John Figurell guilty of a violation of 50 U.S. C. App. § 462 for his failure to notify his local draft board on or about January 12, 1967, of a fact that might have affected his draft status, specifically, that his wife and children were no longer living with him.[1] Figurell appeals from this conviction, claiming that the evidence presented at the trial failed to establish an essential element of the charge, that is, that his violation of the Selective Service rule requiring him to notify his local board of this situation was done "wilfully and knowingly."[2] For the reasons to be stated, we agree and reverse Figurell's conviction.

In order to convict Figurell of a violation of 50 U.S.C. App. § 462, the United States was required to prove not only that Figurell failed to perform his duty to report to his local board the fact that he was no longer living with his wife and children,[3] but also that Figurell knew of this duty and intended not to perform it. *See, e. g., United States*

---

1. The pertinent portion of 50 U.S.C. App. § 462 provides as follows:

   "(a) [A]ny person . . . who in any manner shall *knowingly* fail or neglect or refuse to perform any duty required of him under or in the execution of this title, or rules, regulations, or directions made pursuant to this title, . . . shall upon conviction . . . be punished by imprisonment . . . or a fine . . . or by both such fine and imprisonment. . . ."
   (Emphasis added.)
   See, also, note 3, *infra.*

2. The one-count indictment charged as follows:

   "On or about January 12, 1967 at Wilmington, Delaware in the District of Delaware, Bernard John Figurell, *wilfully and knowingly* did fail and neglect to perform a duty required of him under and in the execution of the Universal Military Training and Service Act and the rules, regulations, and directions duly made pursuant thereto, in that he did fail to notify his local board of a change in his status, that is, that his wife and children were no longer living with him in violation of 50 United States Code, App., Section 462." (Emphasis added.)

See, also, note 1, *supra.*

Figurell has also argued that the delay in his indictment and trial denied him his constitutional right to a speedy trial. In view of our disposition of this case, we need not decide this issue.

3. 32 C.F.R. § 1625.1(b) provides that:
   "Each classified registrant and each person who has filed a request for registrant's deferment should, within ten days after it occurs report to the local board in writing any fact that might result in the registrant being placed in a different classification such as, but not limited to, any change in his occupational, marital, military, or dependency status, or in his physical condition."

   32 C.F.R. § 1622.30 provides that:
   "(a) In Class III–A shall be placed any registrant who has a child or children with whom he maintains a bona fide family relationship in their home. . . . "(b) In Class III–A shall be placed any registrant whose induction into the armed forces would result in extreme hardship (1) to his wife, divorced wife, child . . . who is dependent upon him for support. . . ."
   At the time that his wife and children left him on January 12, 1967, Figurell was

v. Williams, 421 F.2d 600 (10th Cir. 1970); United States v. Rabb, 394 F.2d 230 (3d Cir. 1968).[4]  *See also* Ward v. United States, 344 U.S. 924, 73 S.Ct. 494, 97 L.Ed. 711, rev'g 195 F.2d 441 (5th Cir. 1952). Furthermore, the United States was required to establish that Figurell's knowledge of this duty and intent to evade it existed "on or about January 12, 1967," when it was alleged in the indictment that Figurell violated his duty to report the fact that his wife and children were no longer living with him.[5] There was no direct evi-

---

classified III–A. Neither the district court nor the parties have articulated the exact basis of Figurell's conceded duty to report this separation to his local board. This duty might arise because this was a change in his "marital status" or "dependency status" within the meaning of 32 C.F.R. § 1625.1(b) or because it involved the termination of a "bona fide family relationship [maintained with a child or children] in their home" or a change in his wife's or children's "dependen[cy] upon him for support" within the meaning of 32 C.F.R. § 1622.30. In view of our disposition of the case, we assume, as Figurell has done, without deciding it, that Figurell had a duty to report the fact that his wife and children left him on January 12, 1967. We note, however, that we have not been directed by the parties to any case in which the failure to perform such a duty has been criminally enforced, nor have we discovered such a case in our research of this issue.

4. In *Rabb* this court declared, in the context of a conviction under 50 U.S.C. App. § 462(a), that "[t]he Government must establish knowledge of the legal obligation and voluntary action or omission with the purpose of failing to perform such obligation." 394 F.2d at 233.

In United States v. International Minerals & Chemical Corp., 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971), relied upon in the dissenting opinion, the Court held that in a prosecution for shipping sulfuric acid and hydrofluosilicic acid in interstate commerce and knowingly failing to show on the shipping papers the required classification of this property to wit, corrosive liquid, in violation of 49 C.F.R. § 173.427, it was not necessary for the Government to prove that the defendant knew of the regulation involved. The rationale of the Court was succinctly stated by Justice Douglas in the last paragraph of the opinion:

"In *Balint* [United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604] the Court was dealing with drugs, in *Freed* [United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356] with hand grenades, in this case with sulfuric and other dangerous acids. Pencils, dental floss, paper clips may also be regulated. But they may be the type of products which might raise substantial due process questions if Congress did not require, as in *Murdock*, [United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381] '*mens rea*' as to each ingredient of the offense. But where, as here and as in *Balint* and *Freed*, dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." 402 U.S. at 564–565, 91 S.Ct. at 1701.

There was no suggestion in the opinion that its reach extended beyond the case where the defendant has engaged in some active conduct and where "the probability of regulation is so great" that those falling within its scope "must be presumed to be aware of the regulation." In particular, there is no suggestion that the Court intended to overrule its earlier decision in Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), *in* which the Court vacated a criminal conviction based upon a convicted felon's failure to register as required by a municipal ordinance. In *Lambert* Justice Douglas, *writing for the majority*, noted that "we deal here with conduct that is wholly passive—mere failure to register. It is unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." 355 U.S. at 228, 78 S.Ct. at 243. In these circumstances the Court declared:

"We believe that actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction under the ordinance can stand." 355 U.S. at 229, 78 S.Ct. at 243.

*Cf.* Morisette v. United States, 342 U.S. 246, 260, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

5. Actually, since under the terms of 32 C.F.R. § 1625.1(b) (quoted, *supra*, note 3) Figurell had a duty to report this change in circumstances "within 10 days,"

dence of Figurell's knowledge of this duty during this period. The district court, however, relied essentially on two sets of circumstantial evidence in finding that Figurell had the requisite knowledge: Figurell's good record of reporting to his local board information which was favorable to his III-A deferment status, and Figurell's delivery of a certain forged letter to the local board on May 25, 1967. After a careful consideration of these factors, as well as the other evidence in the record, we have concluded that there is insufficient evidence in the record to establish beyond a reasonable doubt that Figurell knew, on or about January 12, 1967, that he had a duty to report the fact that he was not living with his wife and children and that he "knowingly and wilfully" failed to make such report within the prescribed 10-day period (see note 5, *supra*).[6]

The district court was certainly correct in concluding that it was reasonable to infer from Figurell's good record of reporting information favorable to his III-A status that he was aware of his duty to report unfavorable facts. Indeed, his Selective Service file reveals that by January 12, 1967, Figurell had already reported at least one unfavorable fact to his local board.[7] This record however, does not support a finding beyond a reasonable doubt that Figurell knew in January 1967 that he had a duty to report the particular fact involved in the instant case, that is, the fact that his wife and children were no longer living with him. The facts that Figurell had reported to his draft board prior to January 12, 1967, were all objective facts which were clearly relevant to a III-A deferment status. These facts included his marriage on June 18, 1963 (reported on July 22, 1963), his wife's pregnancies (reported on July 23, 1963, and December 3, 1964), his wife's miscarriage in November 1963 (reported on April 8, 1964), and the births of his children on December 31, 1964, and December 7, 1965 (reported on January 8, 1965, and January 11, 1966, respectively).[8] This record indicates that Figurell was aware that his local board should be informed of changes in his "marital status" in the sense of whether he was married or not, since he had reported the fact of his marriage to the Board.[9] But there is no substantial

the actual violation of 50 U.S.C.App. § 462(a) could not take place until 11 days after January 12, 1967, that is, not until January 23, 1967. Thus, the specific inquiry is whether there is sufficient evidence that by this date Figurell had knowledge of his duty to report the separation to his local board. Whether Figurell had such knowledge after January 23, 1967, and still failed to report to the local board is relevant only to the extent that it casts light on the state of Figurell's knowledge and intent on January 23, 1967, since Figurell's failure to report the change to the local board was not a continuing violation of 50 U.S.C.App. § 462(a). *See* Toussie v. United States, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). Furthermore, even if there were a continuing duty to report the separation to the local board which could form the basis of a criminal conviction for some later period, since the indictment has charged Figurell with a violation only for the period "on or about January 12, 1967" (see note 2, *supra*), conviction for a breach of his duty in some period later

than a week or two beyond January 12, 1967, would constitute, at the least, an impermissible constructive amendment of the indictment.

6. See United States v. Delerme, 457 F.2d 156 (3d Cir. 1972).

7. A note in his Selective Service file indicates that on or about April 8, 1964, Figurell reported that his wife had lost her baby and was no longer expecting.

8. We note that, although on several occasions Figurell reported relevant facts to his local board more than 10 days after they occurred, there is no indication in the record that Figurell was ever informed that these reports were untimely.

9. The United States contends that because Figurell admitted advising his local board of changes in his "marital status" and the births of his children (N.T. 60), "it may be inferred that Figurell also knew he was required to report to the Local Board that he was neither living with nor supporting his wife and children." Brief of appellee at 5. We see no reasonable basis

evidence in Figurell's Selective Service record from which it may be inferred that Figurell knew during January 1967 that the fact that his wife and children were not living with him must be reported to the local board.[10] In the roughly three-and-one-half years of their marriage prior to January 12, 1967, Fi-gurell's wife had left him approximately six times for periods ranging from several weeks to several months.[11] None of these separations had been reported to Figurell's local board,[12] and in each case Figurell's wife and children had eventually returned to live with him. Thus, as the district court acknowledged,[13] Figu-

---

for this inference. There is no evidence in the record that Figurell understood that his "marital status" was changed by the fact that his wife was not living with him; indeed, at the trial Figurell declared:

"I made contacts [to the local board] of my marital status, *my getting married.*" (N.T. 60) (Emphasis added.) Furthermore, the ordinary meaning of the words "marital status" would not suggest that his wife's departure under the circumstances was a significant change. "Status" is defined in Webster's New International Dictionary (3d ed. 1961) as "the condition . . . of a person that determines the nature of his legal personality, his legal capacities, and the nature of the legal relations to the state or to other persons into which he may enter." Thus, the most that can be inferred from the record is that Figurell knew of a duty to report a legal separation, since such a separation would involve a change in his legal relationship to his wife. But there is no substantial evidence in the record that during the period relevant to the indictment (see note 5, *supra*) Figurell knew or should have known that his wife's departure with the children was even the beginning of a legal separation, as in fact it proved to be.

10. See note 9, *supra*. The following colloquy took place on the cross-examination of Figurell by the prosecutor:

"Q. Mr. Figurell, you had your marriage certificate brought into the Draft Board, didn't you? You said you had your father bring your marriage certificate to the Draft Board?

"A. I didn't have my father do a thing. He had brought it in on his own.

"Q. You didn't ask him to do it? You didn't know he was doing it?

"A. The fact is I didn't know he was doing it.

"Q. How about the birth certificates? Did you bring them in or did somebody else do it without your knowledge?

"A. No, I did that.

"Q. Why did you do it?

"A. Because my father told me that I was eligible for the deferment. He explained to me, beings I was married now and that Lea at the time was pregnant, that I would have to be reclassified again and have to let the Local Board know about it.

"Q. What did you think that meant, the reason you were getting reclassified?

"A. Because I was married and had a child.

"Q. Do you think that it mattered whether you were living with them or supporting them?

"A. No, just the fact that I was married." N.T. 87–88.

11. See N.T. 59. Mrs. Figurell testified that there were "quite a few separations" and acknowledged that these separations were "at least several weeks' duration and sometimes months' duration" (N.T. 42). Figurell agreed that there were "numerous separations" during the marriage and testified that the separations lasted "[a]nywhere from two and a half weeks to two and a half months" (N.T. 60).

12. The contention that Figurell's failure to report these prior separations tends to support a finding that he knew of his duty to report the January 12, 1967, separation is rejected. Figurell's failure to report past separations to his local board —absent other circumstances which do not appear in the record—is as consistent with ignorance as with knowledge of a duty to make such reports.

13. The district court declared at page 4 of its opinion (Document No. 23):

"The United States has shown that the defendant had a good record of reporting information favorable to maintenance of the preferred III–A deferment status, and claims one may infer from this that defendant knew of the duty to report those incidents unfavorable to his III–A status. Such an inference is a reasonable one, although not enough in and of itself *to* sustain a conviction."

rell's past record of reporting changes to his local board cannot sustain his conviction.

The proof which the district court found justified Figurell's conviction included a May 15, 1967, letter contained in Figurell's Selective Service file. This letter, which purported to be from Mrs. Figurell but was in fact a forgery, stated that she and her children were now living with Figurell.[14] Apparently, as a result of this letter, Figurell was reclassified from I-A to III-A on June 8, 1967. Although Figurell denied ever having seen the forged letter or having anything to do with its writing (N.T. 76–77),[15] Miss Haggerty, the Executive Secretary of the local board, testified that Figurell personally delivered it to her (N.T. 32).[16] The district court apparently accepted Miss Haggerty's testimony and reasoned that Figurell's delivery of this letter on May 15, 1967, was sufficient under the circumstances [17] to justify a finding that Figurell knew, on or about January 12, 1967, of his duty to report his separation from his wife and children.[18] We cannot agree. The only relevance which this forged letter has to Figurell's guilt is the light which it casts on the state of Figurell's knowledge on or about January 12, 1967.[19] Presumably the district court reasoned that if Figurell delivered the May 15, 1967, forged letter stating that he and his wife were living together, it could be inferred that he was aware of its contents and therefore knew that this fact was relevant to a III-A classification. From this knowledge it could then be inferred from his past record of reporting facts to the local board which he knew to be relevant to his III-A classification that Figurell knew, on or about May 15, 1967, that he had a duty to report the fact that his wife and children were no longer living with him. Even in the absence of additional circumstances, however, proof of this knowledge on May 15, 1967, would be at best weak evidence of

---

14. At the trial, Figurell's attorney objected to the introduction of any records in Figurell's Selective Service file pertaining to incidents occurring after February 9, 1967, on the ground that such matters were "just irrelevant" (N.T. 11). He did not, however, object to Miss Haggerty's testimony that Figurell personally delivered the May 15, 1967, letter to her (N.T. 32) and he has not pressed on appeal his objection to the introduction into evidence of the May 15, 1967, letter. In these circumstances and in view of the result that we reach, we assume, without deciding, that the introduction of this evidence was not error.

15. We also note that although Figurell's Selective Service file reveals that the Delaware State Director of Selective Service requested on March 28, 1968, that the United States Attorney seek an indictment against Figurell for presenting false information to the local board, as well as for failing to report his January 12, 1967, separation, the indictment returned by the Grand Jury on October 1, 1969, charged Figurell only with the latter offense (see note 2, *supra*). With respect to the May 15, 1967, forged letter, the United States stated on page 4 of its brief to this court: "After extensive investigation, the government was unable to determine who

wrote the forgery, or prove Figurell's part in it."

16. See note 14, *supra*.

17. The district court noted that Figurell reached 26 on June 27, 1967, after which he was not, for all practical purposes, subject to the draft.

18. The district court declared at pages 5–6 of its opinion (Doc. No. 23):

"The other proof offered by the United States is the letter delivered to the board by the defendant on May 15, 1967, four months after the alleged failure to report. I regard this seriously. Defendant argues it is no proof of wilfulness and that as far as the United States can demonstrate, he might have found out only on May 15th his duty to report separations. But the facts surrounding this forged letter, i. e., its close proximity to defendant's 26th birthday, and taken in conjunction with his repeated notification of events favorable to his status and failure to notify as to facts unfavorable, such as the numerous prior separations, are sufficient, in my view, to support a finding that the defendant knew of his duty to report the separation of January 12, and wilfully failed to do so."

19. See note 5, *supra*.

Figurell's knowledge of this duty on or about January 12, 1967, some four months earlier.[20] But in the instant case, Figurell's Selective Service file indicates that he was reclassified from III-A to I-A on February 17, 1967, apparently as the result of a report by his wife to the local board on February 9, 1967, that she and their children were no longer living with Figurell. Thus, at least by the time that he received notice of his reclassification on or about February 17, 1967,[21] Figurell became aware of the fact that he could not maintain or secure a III-A deferment if his wife and children were not living with him. In these circumstances, proof that he also had such knowledge on May 15, 1967, when the forged letter was brought into the local board, has slight, if any, additional probative value on the question of whether Figurell had such knowledge on or about January 12, 1967.[22]

From the foregoing, we conclude that there is not sufficient evidence to support the district court's finding beyond a reasonable doubt that Figurell had knowledge on or about January 12, 1967, of his duty to report the fact that his wife and children were no longer living with him.[23] Accordingly, the district court's judgment of conviction will be reversed and the case remanded for entry of judgment of acquittal.[24]

20. *See, e. g.,* Avera v. Florida Towing Corp., 322 F.2d 155, 162 n. 12 (5th Cir. 1963) :
"Obviously the tug owner may not be charged with privity or knowledge by reason of subsequent actions."
Dabney v. Chase National Bank, 98 F. Supp. 807, 839 (S.D.N.Y.1951), aff'd *in part and rev'd in part,* 196 F.2d 668 (2d Cir. 1952) :
"Ordinarily, hindsight evidence is inadmissible to prove or disprove the existence of a previous condition. 'A wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be judged by.' "
*See also* 2 J. H. Wigmore, Evidence, § 244 at 42 (3d ed. 1940) :
"A *prior or subsequent state* of mind indicates, *within certain limits,* its existence at the time in question." (First emphasis in original; second emphasis added.)

21. Figurell testified that he went to his local board on February 9, 1967, to report a change of address and was informed by a clerk there of his duty to report the fact that his wife and children were no longer living with him. N.T. 68–71. But Mrs. Rogers, one of the two regular clerks at the local board during this period, testified that she did not believe that Figurell came in February 9, 1967, with any information because there was no note to this effect in his Selective Service file. N.T. 100–02.

22. We note that in addition to its slight probative value to the issue before the district court, the evidence that Figurell delivered this forged letter to his local board shortly before his 26th birthday suggests that Figurell violated 50 U.S.C. App. § 462(a) by submitting false information in order to obtain a III-A deferment. See note 15, *supra.* Since Figurell was not indicted for this crime, this evidence might, or might not, have been properly excluded under the circumstances because of the danger of unfair prejudice to Figurell. *See, e. g.,* United States v. DeCarlo, 458 F.2d 358 (3d Cir. 1972) ; United States v. Stirone, 262 F.2d 571 (3d Cir. 1959) ; United States v. Sweeney, 262 F.2d 272, 277 (3d Cir. 1959) ; United States v. Bensinger Co., 430 F.2d 584, 593 (8th Cir. 1970) ; United States v. Pate, 426 F.2d 1083, 1086 (7th Cir. 1970) ; Bradley v. United States, 140 U.S.App.D.C. 7, 433 F.2d 1113, 1119 (1969). *Cf.* Rule 403, Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates (November 19, 1971).

23. This conclusion is based upon our examination of all the evidence in the record, including that specifically discussed in this opinion.

24. Counsel for Figurell submitted a motion for judgment of acquittal at the close of the Government's case, upon which the district court reserved decision (N.T. 51–55), and renewed this motion at the close of the trial (N.T. 115). This motion was denied by the district court by order filed with its Memorandum Opinion on May 4, 1971 (Doc. No. 23). That portion of the May 4, 1971, order denying the motion for judgment of acquittal will be vacated.

ALDISERT, Circuit Judge (dissenting).

The majority hold that despite Figurell's failure to keep the local board informed of a fact which might have affected his draft status, 50 U.S.C. App. § 462(a), his conviction was infirm because there was insufficient proof that he "wilfully and knowingly" violated the law. I disagree.

Where the concept of "wilfully and knowingly" becomes central to the litigation, the inconsistency of the relevant case law becomes manifest. Reference to semantic explanations is rarely of great assistance. Often, recourse is made to legislative history for direction, but as regards the specific portion of the Selective Service Act before us, there is no help there.

In an attempt to bring some order out of the chaotic state of statutory and case law, the Commission for the Reform of the Criminal Law has proposed a new codification of the degrees of criminal culpability.[1] Section 302 of the Proposed New Federal Criminal Code[2] would place "intentionally" on the highest rung of culpability; and then, in decreasing order, "knowingly," "recklessly," and "negligently." The Commissioners suggest: "A person engages in conduct . . . (e) 'willfully' if he engages in the conduct intentionally, knowingly, or recklessly." So construed, the proposed code seems to accept the language in United States v. Murdock, 290 U.S. 389, 394–395, 54 S.Ct. 223, 226, 78 L.Ed. 531 (1933): "The word ['willfully'] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. . . . Aid in arriving at the meaning of the word 'willfully' may be afforded by the context in which it is used. . . ." See also, United States v. Vitiello, 363 F.2d 240, 243 (3d Cir. 1963).

Thus, the Code would suggest that what is critical for our analysis is not the equivocal "willfully"; rather we must concentrate on "knowingly."[3] Its

---

1. The "mental element" of Federal crimes is specified in the definitions of the crimes, which definitions are frequently modified, if not indeed distorted, in judicial decisions. If one looks to the statutes alone, the specifications of the mental states form a staggering array: [list of statutes omitted]. Unsurprisingly, the courts have been unable to find substantive correlates for all these varied descriptions of mental states than the statutory language. Not only does the statutory language not reflect accurately or consistently what are the mental elements of the various crimes; there is no discernible pattern or consistent rationale which explains why one crime is defined or understood to require one mental state and another crime another mental state or indeed no mental state at all. Working Papers, National Commission on Reform of Federal Criminal Law, Vol. I, pp. 119–120.

2. § 302 *Requirements of Culpability.*
   (1) Kinds of Culpability. A person engages in conduct:
   (a) "intentionally" if, when he engages in the conduct, it is his purpose to do so;
   (b) "knowingly" if, when he engages in the conduct, he knows or has a firm belief unaccompanied by substantial doubt that he is doing so, whether or not it is his purpose to do so;
   (c) "recklessly" if he engages in the conduct in conscious and clearly unjustifiable disregard of a substantial likelihood of the existence of the relevant facts or risks, such disregard involving a gross deviation from acceptable standards of conduct, . . . ;
   (d) "negligently" if he engages in the conduct in unreasonable disregard of a substantial likelihood of the existence of the relevant facts or risks, such disregard involving a gross deviation from acceptable standards of conduct; and
   (e) "willfully" if he engages in the conduct intentionally, knowingly, or recklessly.

3. Widely used definitions of "willfully" and "knowingly" in the sense of omitting to perform an act are set forth in Devitt and Blackmar, Federal Jury Practice and Instructions, § 16.08: "'Knowingly'—To Omit. An omission or a failure to act is 'knowingly' done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason." § 16.14: "'Willfully'—To Omit. An omission or failure to act is 'willfully' done, if done voluntarily and intention-

general meaning is associated with conduct which is voluntary, and not inadvertent or accidental.

In any event, this elemental emphasis becomes important so there will be no unnecessary confusion between the statutory standard of "knowingly" and the expression "knowledge" which, regrettably, has crept into the cases.

I do not construe the majority opinion to suggest, nor do I understand this court to have ever held, that in a criminal prosecution under the Selective Service Act, the government must prove that the defendant had actual knowledge of the allegedly violated statute or regulation. Such an interpretation would run counter to orthodox traditions associated with prosecutions of those cases in which it is not necessary to prove specific intent.

In United States v. International Minerals & Chemical Corp., 402 U.S. 558, 563, 91 S.Ct. 1697, 1701, 29 L.Ed.2d 178 (1971), the Court had before it a conviction based on an information that the defendant " 'did knowingly fail to show on the shipping papers the required classification of said property, to wit, Corrosive Liquid, in violation of 49 C.F.R. 173.427.' " "The sole and narrow question [was] whether 'knowledge' of the regulation is also required," and, holding that such was not required, the Court, speaking through Justice Douglas, said:

> The principle that ignorance of the law is no defense applies whether the law be a statute or a duly promulgat-

ed and published regulation. In the context of [this legislative history] we decline to attribute to Congress the inaccurate view that that Act requires proof of knowledge of the law, as well as the facts, and that it intended to endorse that interpretation by retaining the word "knowingly." We conclude that the meager legislative history . . . makes unwarranted the conclusion that Congress abandoned the general rule and required knowledge of both the facts and the pertinent law before a criminal conviction could be sustained under this Act.

Thus, in United States v. Rabb, 394 F.2d 230, 233 (3d Cir. 1968), when we said, "The Government must establish knowledge of the legal obligation and voluntary action or omission with the purpose of failing to perform such obligation," it was not meant that the government prove actual knowledge by the defendant of the allegedly violated regulation. The court's statement was nothing more than re-assertion that prosecutions under the Selective Service Act required proof of the necessary *mens rea*. Any other interpretation would run counter to Justice Douglas' re-affirmance in *International Minerals* of the principle that ignorance of the law is no defense.[4]

But the problem does not disappear when we conclude that "knowingly" relates only to *mens rea*, because critical to a determination of a deliberate fail-

---

ally, and with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law."

4. The experience of the Supreme Court with prosecutions of *malum prohibitum* regulations has not been free from difficulties. See, *e. g.*, Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957), vacated a conviction based on the failure of convicted felons to register under a Los Angeles municipal code. The Court held that the mere failure to register was quite "unlike the com-

mission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." In United States v. Dotterweich, 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943), the Court approved the imposition of a penalty on a corporate officer whose firm shipped adulterated and misbranded drugs, "though consciousness of wrongdoing be totally wanting." In United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (possession of hand grenades), the Court said "The present case is [not] in the category . . . of *Lambert* . . . but is closer to *Dotterweich*."

ure to act must be proof that the failure was not mere inadvertence. Deliberately failing to make the necessary report to the local board is the conduct proscribed by the regulation; an inadvertent failure to do so is not a criminal offense. And it is in the proof that the conduct was deliberate, and therefore "knowing," that the government is called upon to fashion some relationship between the provisions of the regulation and the defendant, by direct or circumstantial evidence.

In *International Minerals,* the Court gave expression to a test which I believe has relevancy here: "[where] the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." 402 U.S. at 565, 91 S.Ct. at 1701. To paraphrase this test for Selective Service deferment cases, we might ask: Are the specifics of the registrant's life-style which supported his deferment classification, such that there was a likelihood that it would be subject to regulation and control? If so, was it reasonable to presume that the registrant was aware of the existence of the regulation?

It seems to me that the degree of certainty with which the government must establish the requisite intent to obtain a selective service conviction logically varies with the specific offense. It also seems to me that a prosecution for failure to register for the draft would be placed at one extreme. There is widespread knowledge of this requirement within the general public, and especially within the affected age groups. There the government would not be required to devote much evidentiary attention to proving *mens rea.* Similar examples might be: where one had received a student deferment, and was no longer in school; or had received a conscientious objector classification, and then become engaged in selling napalm or rifles to military organizations; or, having been deferred as a minister of religion, changed his occupation to printing for

commercial purposes atheistic literature. A prosecution for failing to respect the technical niceties required for efficient administration of the system, however, presents other considerations. For example, a prosecution for failure to keep the local board advised of one's correct address, without more, and without evidence of any prejudice to the system, would naturally focus on the element of scienter. This prosecution falls somewhere between the extremes.

Presumably, Figurell would have been drafted had he not received III-A status in 1963. 32 C.F.R. § 1622.30 provides:

> *Class III-A: Registrant With a Child or Children; and Registrant Deferred by Reason of Extreme Hardship to Dependents.*—(a) In Class III-A shall be placed any registrant who has a child or children with whom he maintains a bona fide family relationship in their home. . . .

Implicit in the deferment for dependency status under § 1622.30(a) is a Congressional expression of the public interest in preserving some type of family unit beyond mere fatherhood. The Act authorizes deferment of those "in a status with respect to persons (other than wives alone, except in cases of extreme hardship) dependent upon them for support which renders their deferment advisable." 50 U.S.C. App. § 456(h) (1). Dependency means more than purely financial support. Otherwise, there would be no deferment for this reason; there would simply be increased financial allotments for such servicemen. *Cf.,* 32 C.F.R. § 1622.30(d). A deferment on family relationship seems to be based on a salutary policy of keeping the family unit intact, with the father living with and supporting the dependent children. Failure of the father to participate in the family unit would seem to strike at the very foundation of a dependency deferment under § 1622.30(a).

It is against this backdrop that we meet the question whether under all the evidence there were sufficient circumstances to permit a fact-finder to con-

clude that Figurell deliberately, not inadvertently, failed to report his change in his III-A dependency status to his local board. 32 C.F.R. § 1625.1(b) requires the registrant to report "any change in his occupation, marital, military, or dependency status." Section 1622.30(a) requires a "bona fide family relationship in their home." Our function as a reviewing court is not to substitute what finding we would have made had we been the fact-finder. Rather our responsibility is limited to determining whether there is a minimum quantity of evidence to satisfy the requirement of proof of *mens rea*.

The record discloses that on January 12, 1967, Figurell, then in Class III-A, failed to disclose that he and his family were still living together. Previously he had affirmatively reported: on July 22, 1963, that he had been married on June 18, 1963; one day later, on July 23, 1963, he reported that his wife was pregnant; on April 8, 1964, that his wife had miscarried in November, 1963; on December 3, 1964, that his wife was again pregnant; on January 8, 1965, that a child had been born on December 31, 1964; on January 11, 1966, that a second child had been born on December 7, 1965.

Additionally, in May, 1967, he presented to the board a letter, stating that he and his family were living together when, in fact, they had not been living together since January. Previously on February 9, 1967, his wife had reported to the board that he had left the family abode. Six days thereafter his classification was changed from III-A to I-A.

Assuming, without conceding, that only the activities prior to January 17, 1967, constitute relevant circumstantial evidence bearing on the *mens rea* issue, the question which divides this court is whether these circumstances are suffi-

cient to support a finding that Figurell, classified for four years as a III-A, knew that his home and hearth relationship was subject to Selective Service regulations. As set forth in *International Minerals*, was the "probability of regulation so great" for the fact-finder to presume him to be aware of it?

I say yes. The majority says no. And, although what divides this court is strictly a judgment call, I am suggesting that implicit in the majority's view must be a threshold finding that Figurell at no time knew the wording of § 1622.-30(a): "Into Class III-A shall be placed any registrant who has a child or children with whom he maintains a bona fide family relationship *in their home.* . . ." [Emphasis supplied.] I find to be beyond the realities of probable human experience the suggestion that a draft registrant who has successfully applied for and has enjoyed the benefits of a deferment for three and a half years does not know nor has been told the qualifications of that deferment.

Moreover, as here, where there is a history that the registrant was classified III-A in September, 1963, there has to be some rational explanation for subsequent reports to the local board regarding the family unit. On four separate occasions subsequent to his classification, he reported the pregnancies of his wife, the miscarriage, and the births of his children. Such conduct is consistent with knowledge of the regulation; it is totally inconsistent with purely volunteered action.

Reiterating that our function is not to make a finding of the necessary *mens rea*, but to determine whether adequate circumstantial evidence was present to support the trial court's finding, I am satisfied there was sufficient, supportive evidence.

I would affirm the conviction.