UNITED STATES of America, Plaintiff–Appellee,

v.

**Thomas YORK, Defendant–Appellant.**

No. 87–1714.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1988.

Decided July 7, 1988.

Jeffrey B. Steinback, Genson, Steinback & Gillespie, Chicago, Ill., for defendant-appellant.

James P. Fleissner, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, Jr., POSNER and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Fourteen-year-old Tommy York's statements incriminating his father, the defendant-appellant Thomas York, were testified to at trial, not by Tommy, but by Tommy's probation officer. Those statements, which concerned events Tommy allegedly observed when he was nine, were made by Tommy five years later at an interview not under oath and of which no record was made. Besides Tommy, only an Assistant United States Attorney and the probation officer were present at the interview. The district court admitted these hearsay statements at his father's trial pursuant to Federal Rule of Evidence 804(b)(5). The defendant was convicted in a jury trial for arson (18 U.S.C. § 844(i)), conspiracy to commit arson and mail fraud (18 U.S.C. § 371), and mail fraud (18 U.S.C. § 1341). The district court sentenced the defendant to ten years imprisonment on the arson charge and five years imprisonment on each of the other charges to run consecutively. A fine of $23,000 was also imposed. We reverse and remand.

## I. BACKGROUND

An explosion and fire destroyed the Just Friends Lounge on Sunday, April 18, 1981. Gail Maher's body was found in what had been the destroyed building's basement. Thomas York (York) and Maher, good friends for several years, collaborated to purchase the contents and fixtures of Angelo's, a tavern in Summit, Illinois. They continued the tavern operation at this same Summit location, reopening in August, 1979, under the name "Just Friends Lounge." Apparently, York provided all of the capital investment, including the down payment, although Maher issued several promissory notes to York, promising to pay him amounts that totalled approximately $50,000. Maher signed the closing papers, obtained a liquor license in her name, and "sold" the contents and fixtures to York, agreeing to lease back the items at a rate of $250 a month. Individual insurance policies covered the business, York, and Maher. York and Maher were co-beneficiaries on an insurance policy covering the contents and fixtures. They also obtained insurance policies on their lives, naming each other as beneficiaries. York's policy was a $50,000 term policy with double indemnity for accidental death, but because of her poor physical condition (her excessive weight and chronic health problems made her a greater insurance risk), Maher's policy was a more expensive whole life policy, which did not contain a double indemnity clause.

The operation of the lounge went poorly. Just Friends operated at a loss from its opening until its destruction; Maher was never able to make any of the monthly lease-back payments to York. This situation was not helped when Maher neglected to renew the option on the lease during the prescribed period so that instead of an additional five-year term at $900 a month the lounge had a lease for $1,000 a month unilaterally terminable upon thirty days notice by the owners. To keep the business in operation York had injected money into the business at various times, which led to the promissory notes Maher issued to York. York estimated that he had placed $120,000 into the lounge. The fixtures

were worth no more than $40,000, and Maher had no funds to repay him.

The explosive device that destroyed the lounge appeared to be a combination of an incendiary device and a pipe bomb. The incendiary device, constructed of an electric timer, an extension cord running to an outlet, a toy train transformer, and a cigar box rigged as a firing system that pointed at a Kentucky Fried Chicken bucket filled with fuel, was placed on a table in the basement of the lounge. The pipe bomb, a pipe filled with gunpowder, capped at each end and connected to an electric outlet, was also in the basement. In addition, a plug had been removed from the natural gas main. This allowed gas to fill the basement, which exploded when the incendiary device ignited. Maher was found near the igniting device, and the evidence is conflicting whether she was unconscious and killed by the explosion, conscious and killed by the explosion, or dead before the explosion occurred. The doctor who performed the autopsy on Maher's body concluded death was caused by the explosion, but five years later changed his view and concluded she had been beaten to death prior to the explosion. The Chief Medical Examiner of Cook County, however, disputed the beating theory and testified that in his opinion death was due to the explosion. York claimed the benefits from the policy on Maher's life and from the insurance policy on the lounge's fixtures and contents.

At York's trial friends of Maher's, Carol Mroch and John Etschied, testified for the government that Maher had told them about Maher and York's plan to blow up the lounge in order to recover on the insurance policy. This, too, is questioned hearsay objected to by York, but we need not resolve that issue.

Thomas Burke, Tommy York's Youth Services Officer (probation officer), testified that in an interview, the interview now in question, Tommy had stated that he saw an electric timer, a train transformer, a pipe, gunpowder, and a Kentucky Fried Chicken bucket in his father's possession. William Anderson, the owner of a car wash near Just Friends, testified that he saw

York and his car at the lounge between 2:30 and 4:00 p.m. of the afternoon before the explosion. Other witnesses stated that they had not seen York or his car at the lounge that day.

On appeal York argues that Tommy's statement did not qualify for admission under the residual exception to the hearsay rule, Federal Rule of Evidence 804(b)(5), and that admitting the statements also violated the confrontation clause of the sixth amendment. York also argues that the district court erred regarding several other evidentiary rulings. Because we find that the admission of Tommy's statements requires reversal, we need not reach the other issues.

## II. DISCUSSION

Tommy York, during a September 24, 1986, interview attended by Thomas Burke, his state probation officer, and an Assistant United States Attorney, stated or acknowledged that he saw household electric timers, toy train transformers, cut pipe, gunpowder, and Kentucky Fried Chicken buckets in his father's possession, all of which were items of the type found at the detonation spot in the basement of the destroyed lounge. He also stated or acknowledged that he had heard his father tell his mother that "I spent that Saturday with you." Allegedly York said that to his wife after she told York she could not recall whether or not he was home the afternoon before the bombing. Tommy's observations were made in early 1981, when he was nine years old. At the time of the interview and the trial he was about fourteen years of age. Apparently, the government planned to call Tommy as a witness at trial, but during a pretrial hearing Tommy told the district court he would not testify, claiming the fifth amendment privilege against self-incrimination. Instead, the government called probation officer Burke who testified to what Tommy had stated during the September 1986 interview. The district court decided that Burke's testimony was admissible, qualifying as a hearsay exception under Rule 804(b)(5) of the Federal Rules of Evidence,

and not violative of the confrontation clause. We need not discuss the confrontation clause because Rule 804(b)(5) is dispositive of the issue.

Rule 804 accumulates the hearsay exceptions applicable when a declarant is "unavailable." One of the situations fitting within the unavailability definition includes the situation claimed here: " 'Unavailability as a witness' includes situations in which the declarant—(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement...." Fed.R. Evid. 804(a)(1).[1] There are four specific hearsay exceptions enumerated in Rule 804(b). Circumstances not fitting within any of the four specific hearsay exceptions set out in the Rule may still fit into a fifth exception listed in 804(b), the residual or "other exceptions" category:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> ....
>
> (5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of

justice will be best served by admission of the statement into evidence.... Fed.R.Evid. 804(b)(5).

We recognize that

> [i]n applying [the residual] exception the district court has a considerable measure of discretion. If, however, we arrive at a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors," and that the error was prejudicial, we must reverse. We also recognize that Congress "intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." Committee on the Judiciary, S.Rep. No. 93–1277, Note to Paragraph (24), 28 U.S.C.A. Fed.R.Evid. p. 583 (1975).

*Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir.1979) (citations omitted) (discussing both Rule 803(24) and Rule 804(b)(5)).

There is little argument that the bomb components testimony was material and more probative than other evidence in that regard. No other evidence places these or similar items in York's possession.[2] What is vigorously contested here and dispositive of this appeal is the trustworthiness analysis of that hearsay. As is the case with Rule 804(b)(5) in general "[a] trial judge has considerable discretion, within the parameters of the rules of evidence, in determining whether the hearsay statements contain the necessary circumstantial guarantees of trustworthiness." *United States*

---

**1.** Although not the basis for our decision, we do note that the incriminating nature of Tommy's likely testimony, beyond what was already damaging, is not readily apparent. The government claims that under the Juvenile Court Act of Illinois Tommy's trial testimony may have lead to the declaration of Tommy as a delinquent, apparently based on a potential perjury charge. Certainly, Tommy recanted his statement of September 24, and, whatever his testimony at trial, he would have contradicted either the September 24 statement or the recantation. However, we are not sure of the significance of making the inconsistent statements at trial versus making the statement in some other setting. We cannot determine if a testimonial act, which might allow a perjury label to attach, would enhance the potential punishment Tommy

faced. Whether Tommy testified or not Burke already knew of his changing stories because both the September 24 and recanted statements were made in Burke's presence.

**2.** York states that Tommy's statements are not the most probative evidence on the issue because his live testimony should be accorded that status. Certainly this argument can be made as to any hearsay statement offered. This seems to be no more than a rehash of the argument that Tommy was not unavailable, as required by Rule 804(b)(5), and therefore he had to testify or his alleged observations would not be admitted. This determination is best left for the unavailability analysis.

*v. Vretta,* 790 F.2d 651, 659 (7th Cir.), *cert. denied,* 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986).

Seventh Circuit caselaw identifies several factors that may be considered in the trustworthiness analysis, but as *United States v. Guinan* recently pointed out, "we do not suggest that the factors listed [here] are either exhaustive or necessary prerequisites to admissibility under Rule 804(b)(5)." 836 F.2d 350, 355 (7th Cir.1988) (footnotes omitted), *cert. denied,* — U.S. ——, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988). *Guinan* found critical whether the hearsay declarant "had a motive to lie that calls the trustworthiness of her statements into question," *id.,* and whether the declarant's statement was "insufficiently corroborated," *id.* at 356. The factors deemed critical in *Guinan* were two of the four factors found important in *United States v. Boulahanis,* 677 F.2d 586 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). The other two factors relied on by *Boulahanis* were that the unavailable declarant had testified under oath before the grand jury and that the declarant had not been pressured to testify. *Id.* at 588. Other courts have considered, for instance, whether the declarant was under oath and represented by counsel, testified strictly to facts within his or her observation or knowledge, or recanted the testimony, *United States v. Marchini,* 797 F.2d 759, 764 (9th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987). Age may also be a trustworthiness factor.

The United States Attorney contacted Tommy's state probation officer, Burke, and asked permission to interview Tommy. Burke agreed, and Tommy was interviewed on September 24, 1986. At the time of the interview Tommy was living in a foster home. He had been placed in the foster home because he had been "picked up" while accompanying a person who was engaged in shoplifting at a time when Tommy was on probation for residential burglary. At the time York refused to allow Tommy to return home. An Assistant United States Attorney conducted the interview, and it was Tommy's responses to these questions that Burke later testified to at trial. Burke had not questioned Tommy regarding any of these matters prior to the interview. No transcript of the interview was made, Tommy's answers were not given under oath, and the only attorney present was from the United States Attorney's Office. Both Burke and the Assistant United States Attorney took notes, but neither set of notes made its way into the record. Burke may, however, have referred to his notes in testifying at a preliminary hearing. Tommy recanted his testimony several days before he was returned to his father's custody on October 30, 1986. The government learned of these contrary statements at a preliminary hearing conducted December 8, 1986. York was tried thereafter in January of 1987.

The government argues that it was York who failed to make the notes of the interviewers a part of the record. However, it was the government, not York, which bore the burden of demonstrating that the testimony it offered was trustworthy and entitled to an exception under the rule against hearsay testimony. The government also did not offer the testimony of the Assistant United States Attorney who conducted the interview. The government points out that, in an attempt to present the witness with the least apparent bias, it offered the testimony of the state probation officer rather the testimony of an Assistant United States Attorney from the office prosecuting the case. That tactical decision may have been commendable as a means of lessening bias, but it does not adequately aid the government's attempt to show trustworthiness of the resulting hearsay.

The failure to make a transcript of the interview was a serious mistake. Except for the testimony of Burke we are left to speculate about exactly how Tommy came to make the statements attributed to him. We do not know the exact questions asked or the exact answers given, or even the order of the questions asked, or the atmosphere and surrounding circumstances of the questioning. We do know, as the government candidly admitted at oral argu-

ment, that Tommy answered not a single question in the negative. Apparently, not a single placebo question was amongst the lot to ensure that Tommy was considering the substance of each question and answering responsively, rather than simply agreeing with every question that the government posed. The questions could have been leading and suggestive of the answers. Maybe Tommy's most recent brush with the law suggested to him at the time that it was wise to "give" the government what it wanted. The government counters that Tommy was told his responses were to be voluntary and that it was "important to tell the truth." If that suffices to deem the hearsay testimony trustworthy then we have gone a long way toward circumventing the hearsay rule.

The government argues further that Tommy did not know enough about the bombing to manipulate his answers, either to please the government or to punish his father. Although Tommy knew generally of the bombing, according to the government the details of the bombing had not been divulged to anyone outside the investigation, Tommy included. Consistent with this argument is Burke's opinion that Tommy's demeanor suggested that he did not know the significance of the items he told about in the interview. This argument loses some of its force when it is remembered that Tommy was already aware of information that could easily have allowed him to deduce the unspoken focus of the government's questioning. Tommy was asked only about certain things he said he had seen years before in his father's possession. He, of course, knew of the bombing and that it was his father's business associate who had perished in the blast. In addition, although the record is silent regarding the order of questions at the interview, at oral argument the government lent some assistance: Tommy was first asked if his father had an electric timer, and then asked if his father had a pipe, train transformer, gunpowder, and chicken bucket, respectively. We cannot substitute the government's oral argument for information missing from the case record, but if this was the order, it could not have failed to give Tommy a clue as to the nature and thrust of the questioning. Importantly, Tommy's alleged statements were also not sufficiently corroborated, an element important to the *Guinan* holding. 836 F.2d at 356–58.

■ What we have then is the statement of a fourteen-year-old boy about events that he allegedly observed when he was nine. The government claims that Tommy had a motive to tell the truth at the interview, but Tommy also had a motive to misrepresent the truth. Apparently, he was angered at his father's refusal to remove him from the foster home. And, Tommy finally recanted his statements. Against this background, the defendant's inability to cross-examine Tommy is serious and leads us to conclude that the district court erroneously admitted Burke's testimony regarding Tommy's statements. We cannot excuse this error by labelling it harmless. There is other evidence relevant to York's guilt, but this error in these circumstances is too substantial. No other eyewitness testified about these significant items in York's possession. No eyewitness testified about seeing either the bombing or York and Maher together at the tavern near the time of the bombing. *See* Fed.R. Crim. P. 52(a) ("Any error, defect irregularity or variance which does not affect substantial rights shall be disregarded."); *United States v. Nechy,* 827 F.2d 1161, 1169 (7th Cir.1987). *Cf. Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (To declare that a *federal constitutional error* is harmless "the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").[3] We must therefore reverse

3. Federal Rule of Criminal Procedure 52(a) sets out the standard for determining harmless error for non-constitutional errors, such as the violation of 804(b)(5) of the Federal Rules of Evidence. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) ("But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected."). The standard announced by *Chapman v. California* guides the harmless error analysis when consti-

York's conviction and remand the case for a new trial. Circuit Rule 36 shall not apply.[4]

REVERSED AND REMANDED for a new trial.

tutional error is present. Here we have found a non-constitutional error and applied the Rule 52(a) standard. We did not address York's claim that the admission of the evidence violated the confrontation clause, a constitutional error. If we had, the standard would have changed but not the outcome. By not holding the error harmless under 52(a) the error was certainly not harmless under the more rigid standard for harmlessness contained in *Chapman*. However, it might be argued that if the error is held harmless under the non-constitutional standard it may be that a determination of whether a confrontation clause violation has occurred should be made in order to determine if the error is also harmless under the more demanding *Chapman* standard. *See United States v. McCall*, 740 F.2d 1331, 1338 (4th Cir. 1984). *But see id.* at 1342 (Widener, J., concurring).

4. In what appellant's counsel labeled a "prefatory comment" in his opening brief he stated:

Based on the manner in which it ruled, it is fair to say that the trial court had been influenced against York by the mere nature of the allegations leveled against him by the government. It appears that the trial court formed a conscious hostile predisposition in response to these allegations. The trial court admitted numerous items of extremely damaging evidence against York by contorting various hearsay and evidentiary rules beyond tolerable limits. These improper admissions were so prejudicial so as to warrant reversal.

On review of the record, there is absolutely *nothing* which suggests a "hostile predisposition" on the part of the trial judge. The appellant merely did not prevail on some evidentiary rulings. The fact that we have subsequently determined that one of those rulings was incorrect in no way indicates that the trial judge was hostile to the appellant. Unfortunately, this is not the first time unfounded comments, such as those set out above, have appeared in papers filed in this court by this same law firm, Genson, Steinback & Gillespie. Such "flavorings" of the record, which assign improper motives to judicial determinations, trial or appellate, go far beyond the bounds of vigorous advocacy and will not be tolerated. *See, e.g.,* Ill.Ann.Stat. ch. 110A Canon 8; Rule 8–102(b) (Smith-Hurd 1985). We warn counsel in this case, and the bar of this court, to avoid characterization of judicial rulings by impugning the motives of the judge or judges involved, unless the allegations can be supported by more than the fact that a party was unsuccessful in the course of litigation.