McKinley DUDLEY,
Petitioner–Appellant,

v.

Jack DUCKWORTH, Warden, and
Indiana Attorney General,
Respondents–Appellees.

No. 86–2293.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 17, 1988.

Decided Aug. 8, 1988.

Thomas J. McCarthy, Jenner & Block, Chicago, Ill., for petitioner-appellant.

David L. Steiner, Office of Indiana Atty. Gen., Indianapolis, Ind., for respondents-appellees.

Before BAUER, Chief Judge, and WOOD, Jr., and COFFEY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

McKinley Dudley, petitioner-appellant, was convicted by a jury in an Indiana state court of aiding a bank robbery for which codefendants Kennis Butler and Rodney Phillips were convicted in the same trial.[1] The Indiana Supreme Court affirmed their convictions after reviewing numerous alleged errors.[2] Thereafter, Dudley filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. The principal claims Dudley raises in this appeal are that comments by the prosecutor about Dudley's silence violated his rights under the fifth and fourteenth amendments, and further, that the admission of prejudicial and irrelevant evidence violated his fourteenth amendment rights. We need reach only this latter issue.

## I. FACTUAL BACKGROUND

The state charged that four people, Kennis Butler, Rodney Phillips, Edward Pointer, and petitioner-appellant McKinley Dudley, along with Cecil Lewis,[3] on May 27, 1982, executed an armed robbery of a state bank.

The evidence showed that Pointer, Butler, and Phillips drove a blue Oldsmobile to the bank. Butler and Phillips, armed with hand guns, entered the bank and escaped with $8,835. Pointer waited outside in the car to facilitate their escape. After a high-speed chase, during which Phillips fired at the pursuing police, all three were captured and the stolen money recovered.[4]

The state's evidence showed that the participants discussed the robbery several days beforehand in Dudley's presence, and again at Dudley's house the day before the robbery occurred. The evidence also showed the other participants obtained guns from Dudley. Another meeting, at-

---

1. Dudley received a twenty-year sentence for aiding the bank robbery and a thirty-year sentence for being a habitual offender, to be served consecutively. Dudley's codefendants each received twenty-year sentences for bank robbery plus four-year sentences for criminal recklessness.

2. *Dudley v. State,* 480 N.E.2d 881 (Ind.1985).

3. Cecil Lewis, although he admitted participation, avoided being charged as he was given immunity and thereafter cooperated with the prosecution and implicated Dudley.

4. 480 N.E.2d at 889.

tended by all participants, was held at a tavern on the day of the robbery. All defendants agreed to split the proceeds of the bank robbery. The state's evidence further showed that a green Cadillac owned by Dudley was to be used as a switch getaway car, and a blue Oldsmobile belonging to Dudley's girlfriend was to be used by the three defendants initially to go to the bank. When Pointer, Butler, and Phillips left in the Oldsmobile for the bank Dudley and Lewis drove the Cadillac to the prearranged switch point. Dudley decided when he arrived at the switch point that it was not a suitable place so he and Lewis abandoned the project and drove off toward Gary, Indiana. Dudley was arrested after his girlfriend went to the police station to retrieve her misused Oldsmobile.

Dudley testified in his own behalf, denying any participation in the bank robbery, and explained his contacts with the defendants as resulting merely from an agreement he had made with Lewis to fix a friend's car, which just happened to be on the day of the bank robbery.

## II. DISCUSSION

Pointer, originally a codefendant who agreed to testify for the state in exchange for a reduced sentence, was called as a state witness against Dudley. The direct examination began by his answering what his name was, where he lived (with his aunt in Gary, Indiana), where his mother lived (in Chicago), and his age (twenty-three).

Immediately after these few preliminary questions, the prosecutor began the inquiry which, with the responses of the witness, constitutes the challenged testimony. Pointer was then asked "how he felt about testifying." "Nervous" was his response. The prosecutor pursued the subject, asking why he was nervous and what had happened to make him nervous. The witness, Pointer, explained that the prosecutor "kind of upset me this morning." He then added that he had received some phone calls the night before which were intended for him and his mother. He did not know who made the phone calls. Then came a

leading question: "Are you afraid for your girlfriend and your aunt if you testify?" "Yes," Pointer responded. Upon being asked what he was afraid of, he explained that he was afraid that whoever had made the phone calls might threaten or harm his mother, "or anything." At sidebar counsel objected to that line of questioning and asked that it be stricken, moving for a mistrial on the basis that the state was trying to prejudice the defendants by linking the anonymous threats to them. There was nothing, counsel argued, to show that the defendants had anything to do with the alleged phone call threats. The prosecutor defended the question as an attempt to explain the demeanor of the witness and how the witness felt about testifying. In reply, defense counsel argued that the prejudicial effect outweighed any potential relevance to Pointer's demeanor. The prosecutor then added in justification of the testimony that there had been no showing as to who made the phone calls. Defendant's counsel explained that that was exactly his point, a point which also concerns us.

The trial court denied both the mistrial motion and the motion to strike the testimony. The testimony was allowed to stand.[5] The admission of that evidence, petitioner argues, violated his fourteenth amendment protections because the threats admittedly came from an unknown source and were not linked to him or his codefendants except by prejudicial innuendo. That argument for the exclusion of the testimony is the same argument which we understand the state to be using in this court to justify its admission. Both parties cannot be correct. Because the threats were not connected in the evidence to any of the defendants, as the state admits, the state claims that the testimony could not be prejudicial to the defendants. In addition, the state argues that the threat evidence was relevant to Pointer's demeanor on the witness stand. The state further argues that the jury's interest in understanding the reason for Pointer's nervousness was not outweighed by the possible prejudicial effect of threatening telephone call evidence.

---

5. The transcript of this portion of the trial is attached as an appendix.

The Supreme Court of Indiana found that the trial court did not abuse its discretion by admitting the evidence. *Dudley v. State,* 480 N.E.2d 881, 900 (Ind.1985). The state supreme court adopted the state's explanation that the testimony about the anonymous phone calls was necessary to explain Pointer's "extreme nervousness." The district judge subsequently found that the Constitution was not implicated by this exchange because it was a very small incident in a fairly lengthy proceeding and did not amount to a denial of fundamental fairness.

There is at least some agreement between the parties as to the standard of review for this issue. As the petitioner recognizes, the admissibility of evidence is generally a matter of state law. *United States ex rel. DiGiacomo v. Franzen,* 680 F.2d 515, 517 (7th Cir.1982); *United States ex rel. Clark v. Fike,* 538 F.2d 750, 757 (7th Cir.1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977). A writ of habeas corpus should issue, however, when an erroneous evidentiary ruling "is of such magnitude that the result is a denial of fundamental fairness." *United States ex rel. Palmer v. DeRobertis,* 738 F.2d 168, 170 (7th Cir.), *cert. denied,* 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984); *see also Love v. Young,* 781 F.2d 1307, 1312 (7th Cir.), *cert. denied,* 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986); *Cramer v. Fahner,* 683 F.2d 1376, 1385 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982). In determining whether a writ should issue, the court must determine "whether the probative value of the evidence outweighs the prejudice to the accused." *Palmer,* 738 F.2d at 171; *United States ex rel. Durso v. Pate,* 426 F.2d 1083, 1086 (7th Cir.1970), *cert. denied,* 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445 (1971).[6]

■ Indiana courts have held that a witness's testimony concerning threats the witness has received when no connection is shown between the defendant and the threats, can amount to an "evidential harpoon." *Keyser v. State,* 160 Ind.App. 566, 312 N.E.2d 922, 924 (1974); *see also Cox v. State,* 422 N.E.2d 357, 360–63 (Ind.App. 1981). "[S]uch evidence becomes so prejudicial to a defendant that no jury could be expected to apply it solely to the question of the credibility of the witness before it and not to the substantial prejudice of the defendant." *Keyser,* 160 Ind.App. at 569, 312 N.E.2d at 924. In the *Keyser* case, the court found the testimony's prejudicial effect on the defendant to be so great that an instruction to the jury to disregard it was not sufficient to expiate its effect. That error, when combined with others, led the court to reverse and remand the case for a new trial.

In *Cox,* a witness testified that he had received threats regarding his testimony at trial. Although the people who threatened the witness knew he was testifying against Cox, the defendant, there was no evidence that Cox was responsible for or had knowledge of the threats. The trial judge, noting that evidence of threats generally must be connected to the defendant, ruled that this was not necessary where the witness was confined to prison from the date of the alleged offense until the date of trial. 422 N.E.2d at 361. The appellate court found no support for this exception, and ruled that the testimony should have been excluded. *Id.* at 361–62. "Since threats tend to show guilty knowledge or an admission of guilt on the part of the defendant, a proper foundation must be laid showing the threats were made either by the defendant or with his or her knowledge or authorization." *Id.* "Barring such a showing, the highly prejudicial nature of such testimony requires its exclusion." *Id.* at 362.

The Indiana Supreme Court did not mention these prior Indiana appellate court cases in its opinion, nor does the state in its brief in this court. Instead, the supreme court emphasized that the prosecutor made it clear to the trial judge that the testimony was to "explain witness Pointer's extreme

---

**6.** This standard is parallel to the standard of review in a direct appeal. *Durso,* 426 F.2d at 1086.

nervousness." 480 N.E.2d at 900. It is difficult for us to detect any "extreme nervousness" from the record. The prosecutor argued to the trial judge only that she should be permitted to explain the "demeanor" of the witness and why the witness was in the condition that he was. Exactly what Pointer's condition may have been, however, is not described. No clues appear in the record. The prosecutor further argued that her purpose was to explain "just how the witness feels about testifying here." The feelings of the witness about testifying would ordinarily be of no relevance. The trial judge did not make any observation in the record about the witness's condition or behavior.

It is also interesting to note that when the prosecutor asked, "What has happened to make you nervous, Eddie?" Pointer's first response was, "You kind of upset me this morning," adding only after that, "and I got some phone calls last night." It appears that Pointer blamed the prosecutor for contributing to his nervousness because of something she allegedly did or said that morning. The prosecutor proceeded with the additional leading question about Pointer's fears for his girlfriend and aunt. Nothing appears in the record, however, to explain what the prosecutor herself may have said or done to make the witness nervous. The prosecution avoided any explanation of that aspect of the nervousness of the witness.

Going by the record, which is all we have, we find nothing to show nervousness on the part of the witness except the suggestion initiated by the prosecutor's question about how the witness felt about testifying. The transcript reflects no incoherence, no delay in the witness's responses to questions. No one requested, for instance, a short recess to give the witness an opportunity to compose himself. He was given no opportunity to settle down, assuming he was unduly nervous. It clearly appears that the prosecutor's intent was to put the threat evidence before the jury as soon as Pointer took the stand. As soon as the threat evidence was presented there seems to have been no further concern with his nervousness. After Pointer told about the anonymous threats, all seems to have gone well. This record suggests to us the strong possibility that the prosecutor intended to get the threat testimony before the jury under a pretext. Nervousness is not an uncommon condition affecting witnesses. Those natural anxieties, without more, cannot be a means of admitting otherwise prejudicial evidence. A court may attempt in other ways, at least initially, to make it easier for an anxious witness to proceed. Nervousness often quickly dissipates after the first few questions.

In considering the petitioner's alibi defense, his credibility, because he testified in his own behalf, takes on added significance. Pointer's threat testimony could only reflect adversely on the petitioner even though the threats were not traced to him or his codefendants, except by innuendo. The fact that the supreme court decided this and other issues does not end our own inquiry; in reviewing the denial of the petition for a writ of habeas corpus we must consider these issues in their constitutional context. *See Shillcutt v. Gagnon*, 827 F.2d 1155, 1158 (7th Cir.1987).

The Supreme Court of Indiana found that the defendant was not subjected to "grave peril" by the admission of the testimony. *Dudley v. State*, 480 N.E.2d at 900. That court had earlier applied the "grave peril" standard in *White v. State*, 257 Ind. 64, 272 N.E.2d 312, 319–20 (1971). White was convicted of theft. The issue was the prejudice resulting from the brief testimony of a police officer who said he had previously seen the defendant when he was brought into the police station "with reference to an armed robbery case." 272 N.E. 2d at 313. That robbery case was unrelated to the charge being tried, and the witness had no knowledge of defendant's alleged involvement with the crime for which he was being tried. The state argued the evidence was only for identification purposes. The trial court struck the testimony, but denied the motion for mistrial. The Supreme Court of Indiana (asking, "Identification of what?") reversed, concluding that the prejudicial testimony was offered for no other reason than to

prejudice the jury, a prejudice no instruction could erase. *Id.* at 319. It had placed the defendant in a position of "grave peril." *Id.* at 320.

The situation here is somewhat similar to that in *White*. The record strongly suggests that the evidence of threats was intended more to prejudice the defendants, including petitioner, than to explain away any nervousness of the witness. We believe that more was at issue in the present case than a mere abuse of discretion as found by the state supreme court. This error appears to us to be of constitutionally significant proportions. When the prejudicial effect of the testimony is weighed against its necessity, even assuming the witness's nervousness was extreme, which seems to exaggerate the record, we find that the resulting prejudice mandates relief. We need not try to apply the "grave peril" Indiana standard, however, because we find that the trial court's ruling allowing the testimony to stand "is of such magnitude that the result is a denial of fundamental fairness." *United States ex rel. Palmer v. DeRobertis*, 738 F.2d 168, 170 (7th Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984). The admission of this threat testimony could not but deprive petitioner of his right to present an alibi defense to a jury free from "evidential harpoons." We find the error amounts to a violation of the petitioner's fourteenth amendment right.

■ We do not believe that this error can be considered harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed. 2d 705 (1967); *United States ex rel. Sa-*

*vory v. Lane*, 832 F.2d 1011, 1016 (7th Cir.1987). The evidence of petitioner's guilt was impressive but not overwhelming. *Savory*, 832 F.2d at 1020. In a trial that lasted more than two weeks and involved approximately thirty-three witnesses, only two witnesses, Lewis and Pointer, implicated the petitioner in the robbery. Lewis and Pointer, admitted accomplices testifying in exchange for immunity or dismissal of charges, are inherently dubious witnesses. The strength of their sometimes conflicting testimony does not approach the level required to render this constitutional error harmless.[7]

Although we find we must differ with the judgments of the Supreme Court of Indiana and the district court on this particular issue, we do so reluctantly and with respect for both courts. Even in close questions, however, we are bound to determine the constitutional issues as we see them. This "evidential harpoon" error, to borrow the words of the Indiana appellate court in a prior case, cannot be considered harmless when it could totally undermine the defense offered. Viewed as a whole, the petitioner's trial was constitutionally unfair. The petitioner deserves the writ, but he also deserves to be retried.

Reversed and remanded for the entry of an order granting the petition for a writ of habeas corpus provided the State of Indiana does not retry petitioner within 120 days.

## APPENDIX

The opening portion of the direct testimony of Edward Pointer, Transcript pages 0618–22:

---

7. The petitioner also challenges the propriety of a subsequent exchange between the prosecutor and the witness Pointer. Pointer, on direct examination, was questioned about when he first heard about the contemplated bank robbery. Pointer answered that it was when he was riding alone with Dudley down a particular route referred to as "12."

 Q What was your purpose in going down 12 that day?
 A Me and Kenny [(codefendant Kennis Butler)] was going to rob a liquor store out there.
 Defense counsel immediately objected and moved for a mistrial. The motion was denied,

but the judge struck the testimony and admonished the jury to disregard the last answer.

 The state argues that, although petitioner was in the car at the time, the conversation did not pertain to him. It involved Pointer and another codefendant, but did not directly implicate Dudley. We believe that the trial judge's efforts to cure the possibly prejudicial effect of this testimony in isolation were sufficient to eliminate any prejudice to petitioner resulting from his association with the other two defendants. However, this testimonial episode did not add to the fairness of this trial.

A  Edward Pointer.

Q  Do you have a nickname?

A  Eddie.

Q  Any other nickname?

A  No.

Q  Where do you live, Eddie?

A  560 Pierce in Gary, Indiana.

Q  Who do you live there with?

A  My aunt.

Q  How long have you lived with your aunt?

A  All my life.

Q  Where is your mother?

A  She's there in Chicago.

Q  And your father?

A  I don't know.

Q  How old are you, Eddie?

A  23.

Q  Eddie, how do you feel about testifying here today?

A  Nervous.  Really don't feel up to it.

Q  Why not?

A  Just nervous.

Q  Are your aunt and your girlfriend in the courtroom here today?

A  Yes.

Q  Eddie, you are going to have to talk up a little louder so that the jury and everyone can hear what you say, okay?

A  Yes.

Q  Why don't you feel up to testify here today?

MR GERMANN:  Objection, Your Honor.  The question has been asked and answered.

THE COURT:  Sustained.

MS. VAIDIK:  Q  Why are you nervous, Eddie?

A  Just nervous; that's all, period.

Q  What has happened to make you nervous, Eddie?

A  You kind of upset me this morning, and I got some phone calls last night.

Q  Were those phone calls from me?

A  No, they was for me and my mother.

Q  Do you know who made those phone calls?

A  No.

Q  Are you afraid for your girlfriend and your aunt if you testify?

A  Yes.

Q  What are you afraid of?

A  Whoever calling.

Q  I couldn't hear what you said.

A  Whoever called.

Q  What are you afraid of?

A  May threat or harm my mother or anything.

MR. GERMANN:  Your Honor, may we approach the bench?

THE COURT:  Yes.

(Whereupon the following discussion was had at the bench outside the hearing of the jury:)

MS. VAIDIK:  I am not going to go any further with this line of questioning as to the content of the conversation, and that is the end.

MR. GERMANN:  Your Honor, at this time I am going to move for mistrial.  It is apparent that the State of Indiana is attempting to introduce evidence that threats were made by and on behalf of the Defendants in this case.  There has been no foundation shown that any of these people were directly or indirectly related in that.  The inference is clear that is exactly what has happened.  I ask that the testimony be stricken, that the jury be admonished to disregard it, and on behalf of McKinley Dudley, I move for mistrial.

MS. RUDASICS–HARPER:  On behalf of Defendant Butler, I would join in that motion.

MS. TAPOCSI:  On behalf of Rodney Phillips, I would join in that.

MS. VAIDIK:  I think it is plausible to go to the demeanor of the witness, why he is in the condition that he is right now.  I think that is something the jury should know.  We have not gone into any threatening communications or any such thing, just how the Defendant feels about testifying here.

MR. GERMANN: Your Honor, that may be true, but the prejudicial effect of that certainly outweighs any potential relevance it has to this man's demeanor.

MS. VAIDIK: There has been no implication made whatsoever as to who made those phone calls or what, in fact—

MR. GERMANN: That is the point, Your Honor.

MS. VAIDIK: He says he doesn't know.

THE COURT: Motion for Mistrial will be denied. I will allow the testimony to stand. I will not—if anything further needs to be done on that on cross-examination, fine, but motions will be denied.

(Which concluded the discussion held at the bench.)

COFFEY, Circuit Judge, dissenting.

This court stated in *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1014 (7th Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 972, 83 L.Ed.2d 975 (1985) (quoting *United States ex rel. DiGiacomo v. Franzen*, 680 F.2d 515, 517 (7th Cir.1982)):

"Under 28 U.S.C. § 2254, a federal court is authorized to issue a writ of habeas corpus on behalf of a person in custody under the judgment of a state court 'only on the grounds that [the petitioner] is in custody in violation of the Constitution or laws and treaties of the United States.' *Because the admissibility of evidence in state court is a matter of state law, evidentiary questions are not subject to federal review under § 2254 unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right*."

(Emphasis added). The majority concludes that a mere alleged *evidentiary* error (the inclusion of Edward Pointer's testimony that he was threatened) was so prejudicial as to engender fundamental unfairness in defendant Dudley's trial, in violation of the fourteenth amendment. I am convinced, as was the trial court, the reviewing Indiana

Supreme Court and the reviewing district court, that the probative value of Pointer's threat testimony outweighed any danger of unfair prejudice resulting from its admission, Fed.R.Evid. 403,[1] and thus neither compromised the "fundamental fairness" of the defendant's trial nor denied him "a specific constitutional right." *United States ex rel. Foster*, 741 F.2d at 1014.

Further, even assuming arguendo that the trial court erred in admitting Pointer's threat testimony, I would not hesitate to affirm Dudley's conviction as the evidence of his guilt was "overwhelming," *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1020 (7th Cir.1987), and any trial court error in admitting that testimony was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Accordingly, I respectfully dissent.

I

McKinley Dudley was tried and convicted before a jury in Porter County, Indiana, of aiding a bank robbery. The evidence adduced at trial revealed that Edward Pointer, Kennis Butler, and Rodney Phillips[2] traveled in a blue and white Oldsmobile to the Chesterton State Bank to commit a robbery on May 27, 1982. Together with Dudley they had planned the bank robbery several days before; in fact, Dudley had volunteered the use of his car and guns. On the day of the bank robbery, Dudley followed the Oldsmobile a short distance to the bank in his own car, then parked where it was agreed the accomplices would later switch cars to facilitate their escape. Once at the bank, Butler and Phillips, armed with handguns, entered. Butler pointed a gun at a teller, Kay Leggett, entered the tellers' area, and removed approximately $8,835.00. Butler and Phillips then fled to the Oldsmobile where Pointer was waiting. The bank authorities immediately notified the Portage Police Department.

---

1. Rule 403 of the Federal Rules of Evidence states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."

2. Phillips has a pending writ of habeas corpus in the Northern District of Indiana.

After receiving a description of the armed robbers and their vehicle on a police radio dispatch, Portage Police Officers Fred Trathen and Charles Heimberg, driving in separate squad cars, observed and immediately followed a car with three occupants fitting the radioed description. After the officers were unsuccessful in their attempt to stop the car, a high-speed chase with speeds in excess of 100 miles per hour ensued on Interstate 94. Phillips, sitting in the rear car seat, fired four gunshots at Officer Trathen. The pursued car finally came to a sudden stop on the side of the road. All three passengers attempted to flee but were apprehended shortly thereafter.

Three witnesses for the state, Edward Pointer, Cecil Lewis (who had known Dudley for about 20 years), and Gerri Peters (Dudley's girlfriend), provided the evidence linking Dudley to the bank robbery.

At trial, Lewis testified that the perpetrators discussed plans for the bank robbery in Dudley's presence on three separate occasions: two days in advance of the crime, again at Dudley's house the day before the crime, and finally, as Pointer also testified, at the Nova Lounge the day of the crime. Lewis further recited that Dudley had supplied the bank robbers with the guns that were necessary for the bank robbery. Both Lewis and Pointer testified that the bank robbers agreed at the Nova Lounge to split their shares of the bank robbery loot equally, and both confirmed that Dudley told his accomplices that he was supplying his car and the guns to be used in the robbery. Pointer added that Dudley went so far as to check Butler's gun to make sure it was working properly.

According to Lewis, the robbers agreed at the Nova Lounge to have Dudley drive his green Cadillac as a getaway car. In addition, the plan called for Pointer to drive the blue and white Oldsmobile belonging to Dudley's girlfriend to the bank and immediately after the robbery to exchange the cars at a designated point known to Dudley. Lewis testified that as the robbery plans proceeded, Pointer, Butler and Phillips went to rob the Chesterton State Bank while he and Dudley went to the car-transfer point to await the arrival of the robbers and switch cars from the one used in the robbery to facilitate the bank robbers' getaway. As it turned out, while the robbery was in progress, Dudley decided he did not agree with the previously designated switch point, and he left the scene at this time.

Dudley's girlfriend, Gerri Peters, testified that she saw Dudley show Lewis his guns prior to the bank robbery, and she later identified those same guns as the ones used in the bank heist. Peters also confirmed that Dudley borrowed her Oldsmobile allegedly because he was concerned about a "bent rim on the back" of his Cadillac. Later that day, Dudley, upon seeing Peters, stated that he had let "a friend" use her car and that he would return it later. Further, Peters confirmed that it was her car that was being held by the Portage Police Department (following the capture of the bank robbers).

In his testimony, Dudley denied participation in the bank robbery and explained his contacts with the defendants as resulting from an agreement he had made with Lewis to fix a friend's car on the date of the bank robbery. However, the car that was allegedly to have been repaired was not even in Portage, Indiana (the actual destination of Dudley and Lewis), but was in Aetna, a neighborhood of Gary, Indiana, 15 miles from Portage. While traveling together, Dudley never questioned Lewis as to why the two were heading towards Portage even though Dudley knew full well the broken down car was in Aetna, thus casting substantial doubt on the veracity of his alibi.

During the prosecutor's direct examination of Pointer, the inquiry which constitutes the challenged testimony took place. After the prosecutor asked a few preliminary background questions, then Pointer was asked "How do you feel about testifying here today?" After the witness responded that he was "nervous," the prosecutor inquired why he was nervous. The witness stated, "You kind of upset me this morning, and I got some phone calls last

night." Pointer further testified that he did not know who made the phone calls to him, and that he was concerned that whoever made the calls would harm his girlfriend or members of his family if he testified.[3]

Pointer, after expressing concern for the safety of his girlfriend and aunt, testified that he was afraid that the caller "[m]ay threat or harm my mother or anything." At that point, Dudley's counsel asked to approach the bench with the prosecutor and objected to this line of questioning. During a sidebar conference, the prosecutor immediately indicated that she was not going to pursue the present line of questioning any further. Defense counsel asked that the testimony be stricken, that the jury be admonished to disregard it, and that a mistrial be granted, contending that the state was trying to create the inference that the threats were made on behalf of the petitioner. The record discloses that the defense counsel did not at any time during the trial question the fact that Pointer was nervous, and further, defense counsel failed to substantiate his reason for stating that Pointer's testimony implied that the alleged threats were actually made on behalf of Dudley, as opposed to either or both of the other two co-defendants on trial. On the other hand, the prosecutor defended her questions as an attempt to explain to the jury the "demeanor of the witness, why he is in the condition [nervous] he is right now." Further, the prosecutor stated "[w]e have not gone into any threatening communications or any such thing, just how the defendant feels about testifying here." Defense counsel responded that "the prejudicial effect of [the testimony] outweighs any potential relevance as to [Pointer's] demeanor." The trial judge denied the motion for mistrial and allowed the testimony to stand.[4] The prosecutor then began a new line of inquiry. This testimony took place on the second day of a more than two-week trial.

After the trial, the jury found the petitioner guilty of aiding the bank robbery, and he received a 20–year prison sentence which was enhanced by 30 years for being a habitual offender under Indiana law.

## II

This court and other circuits have properly weighed and accepted the probative value of threat evidence. *United States v. Peters*, 791 F.2d 1270, 1291 (7th Cir.1986), *United States v. Guerrero*, 803 F.2d 783, 786 (3d Cir.1986), *United States v. Qamar*, 671 F.2d 732, 736 (2d Cir.1982). Surprisingly, the majority chooses to apply Indiana appellate case law, rather than federal case law (cited below) which holds contrary to the case at hand, calling threat evidence "so prejudicial to a defendant that no jury could be expected to apply it to the question of the credibility of the witness before it and not to the substantial prejudice of the defendant." *Keyser v. State*, 160 Ind. App. 566, 569, 312 N.E.2d 922, 924 (1974).

Despite this statement of Indiana law (which is clearly not controlling in a federal habeas case), properly applicable federal case law holds that threat testimony, whether allegedly linked to the defendant or giving the inference that the threats were made on behalf of the defendant, is judged in "the normal balancing processes of Fed.R.Evid. 403 balancing." *United States v. DeLillo*, 620 F.2d 939, 944 (2d Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). As noted above, various federal courts have properly determined that threat testimony has probative value and does not necessarily unfairly prejudice a defendant. The Second Circuit, in *Qamar*, 761 F.2d at 736, specifically allowed threat testimony to establish the credibility of a witness who gave testimony wholly inconsistent with that offered by the defendant and to explain that witness's demeanor as related to the judging of credibility. That court ruled "the threat evi-

---

**3.** He did not elaborate on what the prosecutor may have done to upset him.

**4.** The trial judge did not issue a bar to any further inquiry; thus defense counsel had am-

ple opportunity on cross-examination and in his closing argument to address or explain the alleged prejudicial questioning.

dence was useful to explain the demeanor of [the witness], who 'testified in an almost inaudible voice, speaks quickly ... [and] displays on the stand some tendencies to want to get out of here and to get the questioning over with.' " *Id.* (citation omitted). Here, Pointer's nervousness on the stand, uncontested by defense counsel, obviously put his credibility as a witness in doubt; thus an inquiry into an explanation of his demeanor was proper.

Not only are the Indiana cases cited by the majority inapplicable in this federal habeas proceeding, but these cases are also distinguishable from the case at hand. This case involves three defendants on trial while the Indiana cases cited each involve only one defendant. The majority's analogy is misplaced, and it is more than difficult to ascertain how the majority can conceivably conclude that Pointer's limited testimony in any way implicated Dudley specifically as having been responsible for the alleged threats made as opposed to either one or both of the other two co-defendants. Because of the vague nature of Pointer's limited testimony, it is obvious that the majority is only speculating as to who may have made the threats if they were threats. I am convinced that because of the vague and passing nature of Pointer's alleged threat testimony, considering it represented a mere two and one-half pages of a more than 1,400–page transcript and considering that defense counsel failed to cross-examine the witness, argue to the jury, much less file a post-trial motion for mistrial regarding this issue, it confounds me as to how Dudley was unfairly prejudiced. Furthermore, I do not understand the speculation that the jury considered the testimony in regard to anything other than Pointer's demeanor.

Overall, Pointer's testimony refuted Dudley's alibi, denying any participation in the bank robbery. Obviously, the jury faced the credibility issue head on and determined which party it believed. It is well known that the nervous demeanor of a witness can cast damaging suspicion of untruthfulness over a witness's testimony in a jury's mind. A prosecutor is often called upon to attempt to bolster the credibility of

his witnesses within ethical and proper guidelines; thus from my review of the record and the applicable federal case law I see no problem with the prosecutor's limited attempt in this case to explain the problem of nervousness surrounding Pointer's testimony. As the Appellees' brief points out, matters which reflect upon the credibility of a witness are proper subjects for exploration at trial. *Saladino v. Walker,* 609 F.2d 1211, 1214 (7th Cir.1979), *United States v. Aleman,* 609 F.2d 298, 307 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). If we are to hold that a prosecutor is not allowed to explain a witness's nervous demeanor on the stand through proper questioning, the weight of his or her testimony will often be greatly diminished.

The majority questions whether Pointer was nervous in the first place, stating, "[i]t is difficult for us to detect 'any extreme nervousness' from the record." It is interesting to note that neither opposing counsel nor the trial judge contradicted the prosecutor's observation of nervousness and statement. I believe that the trial judge was in a far better position to make that judgment and make the proper ruling as he did in this case relating to the witness's demeanor; thus our review should be consequently deferential. Speculation by the majority as to a witness's behavior is misplaced in this case considering we have nothing in the record before us to support the majority's conclusion. In weighing the effect of testimony, the trial court's "exercise of broad discretion will not lightly be disturbed[,]" *United States v. Williams,* 596 F.2d 44, 50 (2d Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979), due to its proximity.

The majority tries to offer as analogous the Indiana Supreme Court case, *White v. State,* 257 Ind. 64, 272 N.E.2d 312 (1971), but I fail to understand the suggestion that the Pointer testimony offered by the prosecutor "was intended more to prejudice" the petitioner "than to explain away any nervousness of the witness." That case had nothing to do with threat testimony, and the analogy drawn is misconceived. The

*White* case involved a prosecutor's eliciting testimony by a police officer about a past armed robbery involving the defendant for no valid reason. In the case at hand, the prosecution had a valid reason to question Pointer as to why he appeared nervous on the witness stand—the threatening phone call. The conclusion reached by the majority as to the prosecutor's intent, in my humble opinion, is nothing more than mere speculation and lacks a foundation. I refuse to attempt to read a motive into the prosecutor's questioning other than the obvious one explaining a nervous witness's demeanor. I would agree that if the prosecutor had a past record of using questionable trial tactics, such as " 'flavorings' of the record, which assign improper motives to judicial determinations," *United States v. York*, 852 F.2d 221, 227 (7th Cir.1988), the majority's speculation may lead to an assumption that could conceivably have some validity. However, because I believe the prosecutor acted in a proper manner, I cannot agree with the majority's speculation.

Dudley argues that Pointer's threat testimony greatly impacted on the jury's decision. Yet, his counsel, at trial, chose not to cross-examine Pointer regarding the threats, although he had ample opportunity. Nor did the petitioner's counsel think it was important enough to address the alleged impact of the threats in his closing argument, where he had more than ample opportunity. Why, if the threat testimony was so important and so prejudicial to his client, didn't the petitioner's counsel file a post-trial motion for judgment of acquittal or a new trial?

In sum, the alleged threat testimony was elicited as part and parcel of an entirely proper line of inquiry into the witness's demeanor (nervousness), a question which was crucial to his believability. While the unsupported testimony from a witness that he or she received an alleged threat may properly be regarded as unfairly prejudicial, particularly when aimed at one defendant in a one-defendant trial, the value of this testimony and the circumstances under which it was elicited must be weighed against that prejudice. Doing so,

I am convinced that any prejudice resulting from the limited inquiry into threats the witness may have received is "substantially outweighed" by the probative value of such an inquiry.

### III

Assuming, arguendo, that the balance of probative value versus prejudice should have been struck against admissibility, I have no doubt this mere alleged evidentiary error should be considered "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. In deciding whether or not a constitutional error is harmless, the Supreme Court stated: " 'The question is whether there is a *reasonable* possibility that the evidence complained of might have contributed to the conviction.' " *Id.* at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)).

This circuit noted in *United States ex rel. Bradley v. Lane*, 834 F.2d 645, 651 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1746, 100 L.Ed.2d 209 (1988), errors that have no "likelihood of changing the result of the trial, ... [or] ... denying [a defendant] a fundamentally fair trial" should not mandate reversal of a conviction. The Supreme Court has also noted that "it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Lane*, 474 U.S. 438, 445, 106 S.Ct. 725, 730, 88 L.Ed.2d 814 (1986) (quoting *United States v. Hastings*, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983)). Because the testimony in question lasted only one minute in a more than two-week-long trial and did not specifically implicate Dudley, I am convinced that it was of no consequence in the conviction of Dudley.

The Supreme Court recognized that "given the myriad of safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as

an error free, perfect trial, and ... the Constitution does not guarantee such a trial." *Id.* (quoting *Hastings,* 461 U.S. at 508, 509, 103 S.Ct. at 1980). The Court has "repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). I am confident that Pointer's threat testimony did not contribute to the jury's decision to convict Dudley of aiding a bank robbery. It was part of a brief exchange that represented only two and one-half pages in a trial transcript of more than 1,400 pages in a trial of over two weeks' duration, and it was testimony that was never even referred to again by either party. Defense counsel had ample opportunity, on cross-examination, in closing argument, and in post-trial motions to address the pertinent testimony but chose not to, thus convincing me, as it did the trial judge, the Indiana Supreme Court, and the habeas court, of the insignificant part it played in convicting Dudley.

The testimony of Lewis, a 20–year associate of Dudley and a co-conspirator in the bank robbery, and the testimony of Peters, Dudley's girlfriend, directly linked Dudley to the crime and was no doubt considered "overwhelming" in the jury's mind. Additionally, Pointer's corroborating testimony and the lack of a valid and truthful alibi by Dudley obviously left no doubt in the jury's mind of his guilt.

Dudley's alibi lacks believability. He claims that he traveled to Aetna with Lewis in order to fix a broken down car. Inexplicably, the pair wound up in Portage, 15 miles away, where the bank robbery took place. In his testimony, Dudley claimed he was unaware of what was to take place in Portage. I find it impossible to believe, as did the jury, the naivete of a 47–year-old habitual criminal who has spent more than one-half of his life (approximately 25 years) in prison and who, according to witnesses, was the mastermind in the planning of the bank robbery. Dudley discussed the robbery plan on more than one prior occasion

and went so far as to not only arrange for the cars but also supplied the guns to be used. Yet, he insists he was only in the town where the bank was located to fix a car, a car that he knew was actually 15 miles away in another town.

Beyond doubt the evidence to convict Dudley was "overwhelming," *Savory,* 832 F.2d at 1020, and Pointer's threat testimony did not contribute to the jury's decision. The majority, instead, chooses to downplay the plethora of evidence, stating that "[t]he evidence of the petitioner's guilt was impressive but not overwhelming." *Dudley,* in organizing the bank robbery, participated in several discussions of the robbery plan prior to the actual crime, including the one that took place in his own home. Secondly, he supplied the necessities, the cars and guns, to facilitate the plan and even went so far as to check out the operating capabilities of one of the co-defendant's guns prior to the bank robbery. He was present when the parties agreed to the division of the robbery loot equally. He drove with Lewis to the planned switching point where the robbers were going to change cars after the bank robbery. He told his girlfriend that he let "a friend" use her car when in fact he planned for its use in facilitating the robbery. And finally, he offers no valid explanation for his presence in Portage on the day the armed robbery took place. I am convinced, as was the jury, the Indiana Supreme Court, and the district court, that the evidence of Dudley's guilt was "overwhelming."

Further, Dudley's role in planning the bank robbery clearly demonstrates to me that he in fact was "the mastermind" of the entire crime. Dudley was much older than his accomplices and was a pro in criminal matters.

The majority tries to downplay the key testimony of the accomplices, Lewis and Pointer, stating that "admitted accomplices testifying in exchange for immunity or dismissal of charges, are inherently dubious." When reviewing the sufficiency of the government's evidence, courts must view all the evidence, drawing all reasonable inferences therefrom in the light most fa-

vorable to the government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Abayomi,* 820 F.2d 902, 905 (7th Cir. 1987). We must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Draiman,* 784 F.2d 248, 251 (7th Cir.1986). A review of the trial transcript compels an affirmative response to this question. It is well settled that matters of credibility are inherently within the province of the jury, and "absent extraordinary circumstances," this court should not reevaluate the testimony of witnesses to examine their motives or other measures of reliability. *United States v. Garner,* 837 F.2d 1404, 1423 (7th Cir.1987). Further, "the fact that [the witness] has consistently lied in the past, engaged in various criminal activities, thought that his testimony would benefit him ... does not make his testimony unbelievable." *United States v. Rivera,* 775 F.2d 1559, 1561 (11th Cir.1985). *See also United States v. Cravero,* 530 F.2d 666, 670 (5th Cir.1976). As the Eleventh Circuit has stated, "[a] judgment of acquittal 'is not required because the government's case includes testimony by an array of scoundrels, liars and brigands.'" *Rivera,* 775 F.2d at 1561 (quoting *United States v. Hewitt,* 663 F.2d 1381, 1385 (11th Cir. 1981)). Thus, the testimony of Lewis and Pointer should not be besmirched simply because it was given as part of a plea agreement. "In this imperfect world, a litigant must often take the witness as he or she is, imperfections and all. We cannot expect that witnesses will possess the credibility of people of the cloth, such as rabbis, priests, and nuns; that is why one of the jury's roles is to decide the credibility of witnesses." *United States v. Rovetuso,* 768 F.2d 809, 819 (7th Cir.1985), *cert. denied,* 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986). The two witnesses were key players in the bank robbery and their testimony, in general, corroborated the state's claims and was believed by the jury. Further, Indiana Pattern Jury Instruction 12.31 [5] used as a jury charge in this case stresses that an accomplice's testimony "is to be received and weighed by the jury in the same manner and according to the same rules as the evidence of any other witness."

The majority overlooks that jury charge to weigh the accomplice's testimony "in the same manner and according to the same rules as the evidence of any other witness" and casts aside the damaging testimony of Peters linking Dudley to the cars and guns used in the bank robbery. The testimony of Lewis, Pointer and Peters was believed by the jury, and I am convinced that it should be given its proper weight.

Contrary to the claims of the majority, the testimony of the accomplices, Lewis and Pointer, did not conflict in any important material respect. Pointer confirmed Lewis' testimony that prior robbery plans had been made at the Nova Lounge. Lewis confirmed Pointer's testimony that he was told by Dudley that Dudley's car and guns were going to be used in the bank robbery. Also, Pointer confirmed Lewis' testimony about the location of a switching point and about the division of the proceeds among the robbers. Any conflicts in their testimony were of no consequence.

Upon review of the record and the applicable case law, Dudley has failed to persuade me that the trial court abused its discretion and that his fourteenth amendment rights were violated. I agree with the trial court, the Indiana Supreme Court and the district court that Pointer's testimony was properly admissible. Also, I am convinced, as was the district court, that Dudley's claim did not amount to a denial of fundamental fairness and thus does not rise to the level of a constitutional violation.

---

**5.** Indiana Pattern Jury Instruction 12.31 states in full:

"An accomplice witness is one who testifies that he was involved in the commission of a crime with the defendant. An accomplice is competent as a witness for the State or the defendant in the trial of criminal cause. The testimony of an accomplice is to be received and weighed by the jury in the same manner and according to the same rules as the evidence of any other witness."

## IV

I respectfully disagree and dissent from the majority's decision and would affirm the order of the other three judicial tribunals and deny Dudley's petition for a writ of habeas corpus.